**Adella D. GRAY, Plaintiff,**

v.

**UNIVERSITY OF ARKANSAS and the Board of Trustees of the University of Arkansas as a Public Body Corporate, Defendants.**

Civ. No. 86–5029.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

April 20, 1987.

John T. Lavey of Lavey, Harmon and Burnett, Little Rock, Ark., for plaintiff.

Fred H. Harrison, General Counsel, University of Arkansas, Little Rock, Ark., Ginger P. Crisp, Associate General Counsel, University of Arkansas, Fayetteville, Ark., and C.R. McNair, III, Asst. Atty. Gen., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

### FACTS

This is a case in which the plaintiff, Adella D. Gray, claims that the defendants, the University of Arkansas and its Board of Trustees, her employer, discriminated against her by reason of her sex. The case is brought pursuant to section 706 of the Civil Rights Act of 1964 (42 U.S.C. § 2000e–5). The court has jurisdiction of the matter by reason of the provisions of 28 U.S.C. § 1343.

Substantial facts are not in significant dispute. From 1977 until early in 1982, Gray was employed, first as a graduate assistant, and subsequently as a research assistant, and finally as a probation program coordinator, by the Learning Resources Unit at the University of Arkansas. In those capacities, among other things, she was responsible for giving aid to students with scholastic difficulties. In those jobs she often was called upon to give assistance to University of Arkansas athletes with learning difficulties or grade or eligibility problems. In May of 1981, eleven football players "flunked" and were dismissed from the University of Arkansas. This, along with her experiences in her job, caused her to become interested in the possibility of the University of Arkansas Athletic Department establishing a full-time academic counselor or academic coordinator for athletes. She discussed this with her supervisor who referred her to another individual, and after these discussions, a "grant" was prepared and presented to the head football coach at that time, Lou Holtz, and the basketball coach, Eddie Sutton. Ms. Gray "sold" them on the program, and it was subsequently presented to the athletic director, J. Frank Broyles. The position was established, and, primarily because of the recommendation of Holtz and Sutton, Ms. Gray was hired to fill the position that she had created. She began in this capacity approximately March 15, 1982.

At that time, the "hierarchy" in the Athletic Department at the University of Arkansas was J. Frank Broyles, Athletic Director, Lon Farrell, Assistant Director of Athletics, Lou Holtz, Head Football Coach, and Eddie Sutton, Head Basketball Coach. Broyles had been the Athletic Director of the University from July 1, 1973, and was the head football coach for a number of years prior to that. The evidence indicates that he was the person responsible for the operation of the Athletic Department during most of his tenure with the University of Arkansas.

Starting in 1961, Lon Farrell became associated with Broyles, first as a graduate assistant coach. Broyles described his relationship with Farrell as "the closest professional friend I have ever had in my life." This relationship evolved eventually into Farrell having the position of being the person who operated the Athletic Department on a day-to-day basis, except for the

financial functions which Broyles retained. Farrell was responsible for all personnel matters in relation to the coaching functions and, among other things, was responsible for writing up vacancy announcements, seeing that the advertising was properly done, and the interviewing of applicants. In effect, he was responsible for seeing that the affirmative action program of the University of Arkansas, to be discussed in more detail later, was complied with. He remained the operations manager for the department until the summer of 1984 when certain changes were made due to the illness of Dr. Farrell to be discussed later.

According to Broyles, although an organization chart of the Athletic Department would indicate that both Farrell and the academic coordinator worked for Broyles, in reality, they reported to the head basketball coach and head football coach. In fact, Broyles said that everyone worked for the coaches, even him, in a sense, because the department was in existence to make these two major sports programs successful. Based on the evidence elicited at the trial, it appears to the court that, although Broyles was "in charge," he did not often overrule the desires of the football and basketball coaches except in matters which he felt strongly about. In short, if either of these coaches wanted certain personnel to work in the department, or wanted the department organized in a particular manner, they usually got their wishes unless Broyles had a firm belief that they were not only wrong, but that the doing of the particular thing desired by the coaches would harm the overall athletic program at the University of Arkansas.

Mr. Broyles said, more than once, during his testimony that "that is not my style." His management style seemed to be that he attempted to hire the best persons available for the particular positions being filled, and that he then turned the functions of those positions over to the persons who were responsible. It appears that those individuals were allowed to do their job in the manner that they felt best and to keep their jobs so long as they performed them in a manner which was satisfactory to Broyles. As far as the coaches were concerned, as Mr. Broyles said, they were evaluated yearly on the basis of their won-loss record, and since their very job depended upon them performing in a manner satisfactory to both him and the public, Broyles felt that it was proper to give them considerable leeway in doing their job.

At the time that Adella Gray created the job of academic coordinator, and was hired to fill it, the basketball coach was Eddie Sutton, and the football coach was Lou Holtz. At the time, she was highly recommended by both Lou Holtz and Eddie Sutton, it being apparent that she had been able to convince them, without any question, that she was the proper person to fill the job. At the time that she was retained, Broyles, Lon Farrell and Dr. Fred Vescolani, who was at that time the Dean of the College of Education, discussed Ms. Gray. Farrell and Vescolani had certain reservations about hiring her. Farrell, it appears, was not certain that this job, with its intended functions, should be filled by a woman (a view that he later discarded). Dr. Vescolani, based on his experience with Ms. Gray in her job with the Learning Resources Unit, felt that she was "too pushy" and did not have particularly good relations with University of Arkansas faculty. Broyles, in effect, overruled both Farrell and Vescolani because the two coaches recommended her and wanted her to fill the job.

Beginning approximately the middle of March, 1982, Ms. Gray became the full-time athletic coordinator, and was responsible not only for obtaining tutors and other help for athletes with academic difficulties, she was, in effect, charged with keeping the necessary records to ensure that athletes stayed eligible under the rules of the National Collegiate Athletic Association. In this function, Ms. Gray was to advise athletes on their course of study, and to provide them with academic help, through tutors, when necessary. In this capacity it was necessary for her to have daily contact with faculty teaching courses in which athletes were enrolled.

Shortly after July 11, 1983, Broyles received a letter dated that date from Keneth Kinnamon (Defendants' Ex. 13) reporting an alleged incident with Ms. Gray on May 13, 1983. Kinnamon, a professor of English in the J. William Fulbright College of Arts and Sciences, reported to Mr. Broyles in the letter that on May 13, 1983, Ms. Gray had called Charles Wiggins, a graduate assistant in the English Department, about the academic situation of a football player. The player had received a D grade in a class taught by Wiggins in the spring semester. It was reported to Broyles in the letter that Gray had asked Wiggins whether it would be possible to change the player's grade from a D to an incomplete so that he could take the course again the following fall and, thus, preserve his athletic eligibility. According to the letter, Wiggins reported the incident to Professor Kinnamon, and Kinnamon declined to allow the change to be made, believing that it was wrong. It appears from the letter that Kinnamon was not only upset because of the request, but angry because of what he believed, and apparently Wiggins believed, was a veiled threat made by Ms. Gray. According to Kinnamon, "the situation was considerably exacerbated because in the same conversation Mrs. Gray spoke of Mr. Wiggins' work as a tutor for the Athletic Department, expressing the hope that he could be employed again next year in this capacity." Professor Kinnamon, and apparently Wiggins, took this as a threat that if Wiggins did not comply with Gray's request, he would not be hired again. Broyles responded to Professor Kinnamon by letter dated July 21, 1983 (Defendants' Ex. 14), advising that that was not the policy of the Athletic Department and that Ms. Gray had been wrong. In the letter he says, "in discussing this incident with Mrs. Gray, she states that it was not her intent to bring any undue influence to bear on Mr. Wiggins and she regrets if her intention was not made clear to him." Broyles' letter indicates that a copy of it was being made available to Ms. Gray. According to Gray, she subsequently talked to Broyles about the matter and explained her side of it to him and that he said, "Well, let's just

learn from our mistakes." Ms. Gray did not consider that statement to be a reprimand because Broyles said it with a smile on his face.

In August of 1983 the incident that became known during the trial as the "Eddie White incident" occurred. Eddie White was a starting and apparently important football player for the University of Arkansas. It was learned at that time that White would be ineligible for the following season because he had repeated a course in the spring that he had previously taken. Neither Ms. Gray nor the other persons at the University of Arkansas responsible for advising students caught the error, and White did not recognize while he was taking the course that he had already taken it. Because that repeated course did not count toward the NCAA requirements, White was ineligible and was not allowed to play football for the season beginning in the fall of 1983. According to Broyles, the White incident was harmful to and very embarrassing to the Athletic Department. He says that it was a routine matter that should have been caught and that it harmed the team. According to Broyles, Coach Holtz called a team meeting and went into a rage. He said that he doesn't know how harmful the incident was, but pointed out that that year Holtz and the football team only won five games. That was Coach Holtz's last year as the head football coach at the University of Arkansas.

At least at the time of the Eddie White incident, it appears that Ms. Gray took at least some of the blame and admitted that she should have caught the error. She now seems to believe, and wants the court to believe, that her acceptance of blame was magnanimously given and that it was really not her fault to any degree. It was, according to Ms. Gray, the fault of others.

After the 1983 football season was completed, Lou Holtz was replaced as the football coach by the present coach, Ken Hatfield. Mr. Hatfield was hired on December 22, 1983, and began work on January 1, 1984. Mr. Hatfield had been the head coach at the Air Force Academy in Colora-

do prior to this employment, and he brought most of his staff with him, replacing staff left by Holtz. Although no one seems to be sure, it is probable that Hatfield met Adella Gray during one of his visits to the University, and it appears that he decided at that time not to replace her with a staff member of his own choice, but, instead, to continue her in her position. At some point he apparently instructed her to keep handling things as she had in the past.

On January 8, 1984, Hatfield met with his staff, including Ms. Gray, and outlined the program that he expected to conduct at the University of Arkansas. He announced that it was his belief that players were largely responsible for their own actions and that they would be responsible for getting to class on time and to perform the functions necessary to stay in school and stay eligible. Coach Holtz had had many night meetings of the football team and Sunday practices, and Hatfield discontinued these, he says in order to give the players more time to study and to do the things they should do to stay in school and progress towards graduation.

At about the same time, the middle of January, 1984, Coach Sutton (who testified by deposition from his post at the University of Kentucky) decided that Ms. Gray had more to do in counseling both football and basketball players than she could accomplish, so he transferred those duties in relation to the basketball team to his wife, Patsy Sutton. From that time forward, Ms. Gray was responsible only for the academic counseling of the football players.

In the fall of 1983, Larry Dixon was a volunteer football coach and dormitory counselor for the Razorback team. When Hatfield took over as head football coach on January 1, 1984, Dixon assumed the responsibility of coordinating all of the recruiting efforts made by the Athletic Department for football during the spring of 1984. Then, in April of 1984, a new position of academic advisor was created, and Dr. Farrell was responsible for advertising for the position and doing the other things necessary to comply with the University of Arkansas affirmative action plan. After advertising, the University received eleven applicants, including Coach Dixon. The job had been created because of new NCAA rules, and Coach Broyles and the staff of the department were not certain of the exact requirements of the job. Coach Dixon was hired, according to Broyles, because he was known by the coaches and staff and knew the athletes and the requirements of the department. Coach Broyles believed that, among other things, Dixon would maintain a degree check for compliance with the new NCAA rules and he knew Dixon to be "a detail person." He anticipated that he would be doing recordkeeping, but he and Dr. Farrell also envisioned him having additional functions. Other persons were not interviewed for the job because they believed that Coach Dixon was the right man for the job and because he was highly recommended by Coach Hatfield.

Hatfield testified that during the spring of 1984 Professor Don White of the Marketing Department at the University of Arkansas called him and angrily told him that one of the Athletic Department tutors had done a paper for a student athlete which the athlete turned in as his own. Hatfield testified that he immediately went to Gray and informed her of this telephone call and advised her that he did not want this to occur in the future. Professor White testified that he did not recall such a telephone call and did not believe that he had made one. In spite of this, Hatfield contended that he received such a call from someone, and the court believes that he did. It may be that he was confused about from whom the call was received, and this, in the court's view, is understandable in view of the passage of time and the number of incidents which he testified about.

Also, Coach Hatfield testified that in the spring of 1984 he had contacts from three or four student athletes who complained that they were having difficulty communicating with Ms. Gray. He told the athletes that their inability to communicate might be their fault. Hatfield said that a student athlete named Bill Lenz came to him and told him that he had lost all respect for Ms. Gray because she had misadvised him re-

garding either his studies or courses she recommended to him. Lenz testified at the trial and denied this, but the court, judging from the witness's demeanor and his hesitancy in answering questions on cross-examination, simply did not believe him. Irrespective of whether these complaints were justified, the court believes that Hatfield did receive such contacts.

The next incident that caused at least some concern in the Athletic Department involved what was known at the trial as the Derrick Thomas incident. Derrick Thomas was a starting football player for the Razorbacks. During the spring and summer of 1984 he was a sophomore by classification, and during that period his faculty adviser was Dr. Laurie Belzung. It appears from the testimony that Dr. Belzung, a professor in the Management Department in the College of Business Administration, had assumed this duty for a number of athletes, even though the plan for the department did not include him as an adviser. According to Professor Charles Hubbard, then Associate Dean to the College of Business Administration, the Department of Management had a prize-winning advising program which involved the hiring of personnel specifically charged with advising students. According to Professor Hubbard, Dr. Belzung "didn't fit into this arrangement" because he was not part of the advising faculty. However, Dr. Belzung continued to advise certain athletes anyway, and Professor Hubbard did not do anything to make a change in this respect out of his deference to Dr. Belzung, a long-time friend.

For the first session of summer school in 1984 Dr. Belzung was on vacation in China, and while he was away, Gray recommended that Thomas take a senior level (fourth level) business course in the second session of summer school. Thomas unquestionably did not have the prerequisites required for this course. Thomas then took his course schedule, including the course which required prerequisites, to the Business School, and because Dr. Belzung was not there, he asked Professor White to approve the course. Professor White refused to do so because he felt that it was not only important, but necessary, for a student to do the work in the course that he have the necessary prerequisites. He said that the prerequisites for the course were a statistics course, two economics courses, one marketing course, one algebra course, and possibly a finite math course, none of which Thomas had. He said that he was disturbed and angered by Gray's signing Thomas up for this course because he takes advising very seriously. He does not believe that advising should be done in the Athletic Department. He then called Coach Broyles and Broyles told him that he would have Coach Hatfield call him. Hatfield did within the next five minutes, and White told Hatfield that he thought it was inappropriate for Athletic Department people to be advising students as to the courses that they should take and that he believed that the role of the Athletic Department should simply be to see that the athletes are advised by their proper faculty adviser.

Hatfield then went to Gray's office with Thomas and asked Gray if she had recommended the fourth level course. She admitted that she had, and explained that she had talked with Belzung, and thought that it was a course that Thomas could handle, in spite of the fact that he did not have the required prerequisites. Thomas was then allowed to leave the office and Hatfield told Gray that he could not understand why she had recommended a fourth level course for Thomas, a sophomore, and that he felt that such actions would cause the Athletic Department to lose credibility with both the faculty and other members of the football team. He told her that he felt that Thomas had lost respect for her because of the incident, and that if he talked to other football players, it would also affect their respect for the advising and counseling functions. Thomas testified at the trial that he had not lost respect for Ms. Gray because of the incident, and it appears that Belzung said that he would have approved the fourth level course, even without the prerequisites, if he had been present when Thomas presented the form.

This brings us to the "Kingsby incident." It seems that Jim Kingsby was a high school football player with great promise as an athlete. Unfortunately, it also appears that he had little if any promise as a student, at least a student that would go to class and attempt to learn. He first came to the University of Arkansas in the fall of 1982, and it is an understatement to say that his academic record at that time was not good. According to Plaintiff's Exhibit 173 (his transcript), during the fall of 1982 he flunked all courses that he took with the exception of a Beginning Swimming course and a Learning Skills course. His cumulative gradepoint average at the end of the first semester was 0.67. In the spring of that year he did a little better, compiling a gradepoint average of 1.19, it appears primarily because he made an A in Beginning Track. At the end of that semester, his cumulative gradepoint average for his academic career at the University of Arkansas was 0.96. Understandably, he was placed on probation January 3, 1983, and he dropped out of school. In the fall of 1983, Kingsby took some correspondence courses to attempt to be readmitted, and Gray worked with him in relation to these courses. Late in December, 1983, Hatfield asked Gray to help Kingsby prepare for his final exams in the correspondence courses, which she did. He received a D, a B, and two Fs. Shortly after January 1, 1984, word reached Hatfield that Kingsby might be interested in again returning to the University to play football, so he had Gray check into the possibility of his being readmitted. More correspondence courses were taken, with Gray's assistance, and he passed those courses. He was readmitted, but in order to be eligible, it was necessary that he take and pass fifteen hours of summer school. According to the testimony, he was enrolled in the first summer school session in Beginning Raquetball, Beginning Canoeing, and something called Industrial Design or Industrial Finishing which was described by one of the witnesses as a course in which the students learned to finish furniture and the like.

It was the policy at the University of Arkansas Athletic Department for the staff to have a great deal of leeway in scheduling their vacations. According to Broyles, the department worked as a "family" and he and Farrell left it to the individual members to determine when they could best take their vacations without interfering unduly with their jobs. Gray had decided to take her vacation the weeks of July 15 and 22, 1984. It appears that on July 13, 1984, Kingsby's grades for the summer school session were to be posted, and the coaches were anxious to determine whether Kingsby received passing grades. When July 13 arrived, Hatfield learned that Gray had apparently decided to start her vacation a day earlier than initially planned, and when he came into the office on that day he learned that she was not there. He called Gray and told her that he wanted her to be present when Kingsby's grades were posted so that, if he failed some of the courses, she would be available to take certain actions to attempt to get him enrolled in other courses, etc., so that he could become eligible. Gray returned to the office and waited, apparently along with the coaches, for Kingsby's grades to be posted, and when they were, it was learned that he passed each of the courses and would be eligible to play football.

Unfortunately, it turned out that in the fall of 1984, Kingsby not only failed to attend classes, he also failed to attend football practices, and he was dismissed from the team by Hatfield.

Gray returned from her vacation on July 28, 1984, and on Sunday, July 29, 1984, Hatfield went to her house after a telephone call to her and, while sitting in her living room, advised her that he had lost faith in her, at least partly because of the Kingsby incident, and that he was going to transfer the academic coordinating duties to Coach Dixon. Gray denies that Hatfield gave her any reasons for the change, but he says that it was because all of the incidents set forth above which had occurred up to that time, and that the Kingsby incident was simply the precipitating factor that caused him to make the decision. Hatfield told Gray at that time that he was going to Little Rock and that when

he returned he, Farrell, Gray, Dixon and Vescolani would sit down and talk about the reorganization of the academic program.

It appears that both Broyles and Dr. Farrell were opposed to the change because neither really believed that Dixon was the right person for the job. However, Broyles, because of his philosophy that it was Hatfield's decision to make, decided that he would support it.

On August 8, 1984, Gray, Hatfield, Dixon and Vescolani met, and as a result of that meeting changes were made. Dixon was, in effect, put in charge of the program, and athletes were divided into three categories, with Gray receiving one of the groups to tutor and advise, with that group apparently being composed primarily of athletes having grade problems. At this meeting, Gray was assigned the duty of maintaining records to ensure that student athletes were in a degree plan, but she was not required to maintain the records required by the new NCAA rules. The responsibility for maintaining those records was assigned to Coach Dixon.

From the August 8 meeting until January of 1985, Dixon, Gray and Vescolani retained the assignments made at that meeting. On January 14, 1985, Hatfield conducted a meeting of the academic counselors and decided that he would return full responsibility for the academic program to Gray. From that time, Gray, among other things, had the responsibility of ensuring that the courses and credits the student athletes had taken in the fall of 1984 were going to count toward a degree plan under the NCAA rules, and, after termination of the spring, 1985, semester, to scrutinize the courses and grades of the student athletes to ensure that they would be eligible to play football in the fall of 1985. In short, Gray was responsible again from that day forward until her termination for the academic counselor or coordinating functions at the University of Arkansas Athletic Department.

On March 15, 1985, Coach Dixon was terminated as an academic advisor and he returned to his job as dormitory counselor.

Commencing on that date, his annual salary was reduced from $22,500.00 per year to $10,400.00 per year. At about the time that Dixon was promoted, Patricia A. Haynes was hired to perform the recordkeeping functions that Dixon had previously performed at an annual salary of $13,000.00 per year. The evidence appears to be uncontradicted that this position is primarily a clerical one. Coach Broyles explained the discrepancy in salaries by stating that at the time Dixon was promoted to the job, it was not certain what the duties would entail, but it was believed that it would require more than clerical abilities.

In early 1985, the "Kevin Wyatt incident" came to light. It turns out that when Wyatt started school at the University in the fall of 1984, he enrolled in the School of Engineering. He had attended a high school in Kansas City with a reputation for tough academics, and his high school record indicated that he could be a good student. Kevin later decided that engineering was not his field, so in the spring of 1983 he transferred to the College of Arts and Sciences. Then, in the summer of 1984, apparently still "searching," he transferred to the College of Business Administration. Sometime prior to the fall of 1984, Wyatt enrolled in an art lecture and an intermediate tennis course, among other courses, and these courses were apparently approved by his advisers and by the academic coordinator. On February 15, 1985, Gray was notified by the office of the Dean of the College of Business Administration that Wyatt had taken three hours in the fall of 1984 for which he would not receive credit (the art lecture and intermediate tennis courses). Gray claimed during the trial that she, both orally and in the form of a written memorandum, told both Hatfield and Coach Trott of the difficulties that Kevin faced. Hatfield denied that he learned of this problem until May of 1985 when it was then too late to do anything about it. All seemed to agree that Kevin was not performing up to his ability academically, and it appears that Hatfield believed that had he known of the problem earlier, he could have taken action to see that the problem was alleviated. He said

that he believed at the time, and appears to now believe, that from January, 1985, one of Ms. Gray's primary responsibilities was to see that the hours taken by students in the fall would count toward the degree plan required by the NCAA regulations. He said he felt that she did not perform her job and, to make matters worse, did not tell him of the problem until it was too late for it to be remedied.

In May of 1985, after the Kevin Wyatt incident, Hatfield decided that he would recommend that Adella Gray not be reappointed when her term ended in July of 1985. On May 20, 1985, Hatfield met with Adella Gray in her office. He, according to his testimony, told her that he was disappointed with the Kevin Wyatt incident and that he did not feel comfortable with the way the academic program was running. He told Ms. Gray that he would recommend to Broyles that her contract not be renewed.

He testified that he felt that when the new academic wing that the Athletic Department was building was completed, he wanted someone there who could get the job done without constant supervision and could properly represent him with the faculty. He felt that Adella Gray had not acted responsibly in the Kevin Wyatt matter, and that she had a "pass the buck attitude." In other words, he said, it was always her attitude that it was someone else's fault. He believed that she should have let him know what was going on in relation to the Kevin Wyatt incident long before she did, but that, instead of letting him know and taking action when she learned of the problem, she again "passed the buck" by blaming Professor Hubbard or someone in his department for misadvising Wyatt. He said that he understood that as a result of that discussion between Gray and Hubbard, there was a heated argument and Hubbard became angry at Gray and the Athletic Department. Hatfield testified that there was no way that the Business School advisers could know of the NCAA rules and that it was Adella Gray's job to interpret the rules and to make certain that they were complied with.

Approximately one week before the May 20 meeting with Gray, Hatfield conferred with Broyles and informed him of his decision to replace Gray as the academic coordinator. At that meeting, Hatfield told Broyles that he wanted to replace Ms. Gray because he did not believe that she had a good working relationship with the faculty and that, in effect, she was not doing her job of keeping athletes eligible or knowing of their status in relation to eligibility properly. Again, as was his custom, Coach Broyles decided to back Coach Hatfield in this decision.

Shortly thereafter, Dr. Farrell was advised of the change and told that he would need to prepare the advertising necessary and accept the applications. At about the same time, or shortly thereafter, Hatfield called Coach Jerry Welch, the football coach and a teacher at Blytheville High School, and told him that he was going to make a change in the academic coordinating position and he asked him if he might be interested in applying for it. Welch had played football with Hatfield at the University of Arkansas. On May 22, 1985, the Athletic Department, through Dr. Farrell, prepared and ran an advertisement for the position. The responsibilities listed in the advertisement were (1) organize study hall; (2) set up tutors for athletes; (3) check graduation progress of male athletes; (4) check class attendance; (5) assist with recruiting; and (6) counsel athletes on a regular basis. The advertisement indicated the applicant must possess (1) a college degree—preferably have a Master's Degree in addition to an undergraduate degree; (2) be extremely honest; and (3) represent the U of A in a dignified manner.

Again, on May 23, 1985, Hatfield called Welch on the phone and asked him if he had considered applying. Welch told Hatfield that he would be applying for the position. Also at about the same time, Hatfield called Major Dick Ellis, who was the academic adviser at the Air Force Academy, and asked him if he would be interested in applying for the job.

A copy of the advertisement was sent to Welch, and shortly after May 23, 1985,

Welch forwarded to the Athletic Department his application. Including Coach Welch, eleven persons applied for the men's academic counselor position. The basketball coach, Nolan Richardson, recommended Dr. Janet R. Wilber, one of the applicants. In mid-June, 1985, Broyles scrutinized the applications, at least of Coach Welch and Wilber, and Coach Welch was selected, primarily because Hatfield recommended him and because Broyles knew him because he had played for Broyles while he was head coach at the University of Arkansas. It appears that Hatfield had confidence in Welch and believed that he was the man for the job and he strongly recommended him to Broyles. As was his custom, Broyles accepted Hatfield's recommendation and Welch was hired effective July 1, 1985, at a salary of $30,000.00 per year. In relation to the salary, Broyles testified that they paid him what they had to give him to move since he was making in the neighborhood of $32,-000.00 at Blytheville.

On approximately May 30, 1985, Hatfield left on Gray's desk a letter dated that date (Plaintiff's Ex. 130) which said:

May 30, 1985

Dear Adella:

This is an official notice of your termination as Academic Coordinator for the Athletic Department.

After being assigned into the Head Coaches position I allowed you to remain as the Academic Coordinator instead of opening the position up to other applicants. I felt you deserved a chance to show your talents in relation to the players motivation and effort toward graduation.

You gave your all and were yourself.

After careful evaluation I feel the Academic Coordinator position demands a tougher disciplinarian who will command the respect and dedication of all our players while developing a harmonious working relationship with faculty, staff members, and others on our campus.

Thank you for your contribution to the Athletic Department and to the young people you have served.

In Love and Truth,
/s/ Ken Hatfield
Ken Hatfield,
Head Football Coach

cc: Frank Broyles

Coach Broyles also notified Gray of the non-renewal by letter dated May 30, 1985, and in that letter he told her that his decision was based upon Hatfield's recommendation. A copy of Hatfield's letter was attached to Broyles' letter.

On July 2, 1985, Dr. Farrell completed the personnel action form required by the University's affirmative action program and filed it with the University's EEO office. The report was completed in pencil and it is not possible to determine the exact reason for termination given by Farrell on the form because on August 9, 1985, he went to the office and erased part of the "Reason." The form as admitted (Plaintiff's Ex. 138) read: "Coach Hatfield had received several reports from the faculty & adm. that her public relations with them had not been good. Also we need a person that can be a strict disciplinarian & go into the dorm and awake athletes that are sleeping in." It appears from viewing the form that the portion of the sentence immediately following "Also we need a person" was erased and changed by Farrell, but it is impossible to tell what changes were made. If it were not for the reasons discussed below in relation to Dr. Farrell's health at the time, the court would view that change with great alarm. In view of the doctor's reports which will be referred to later, the court is not at all certain that much significance can be placed in any action that Dr. Farrell took in July and August of 1985.

On July 2, 1985, Ms. Gray reported to the Broyles Complex to begin cleaning out her office. While there, Dr. Farrell brought to her a resignation form (Plaintiff's Ex. 144), and asked her to sign it. She replied that she was not going to sign it until "she talked with her lawyer." Thereafter, as she was in the process of leaving, she secreted a tape recorder in her briefcase and went into Farrell's office and surreptitiously recorded a conversation that she had

with him. While the transcription is of very poor quality, it appears to the court that the transcript received as Plaintiff's Exhibit 142 reasonably correctly sets forth the portion of the tape that can be understood. Then, on July 23, 1985, Gray called Farrell by phone and surreptitiously taped another conversation with him. While that tape is of better quality than the first, it is also inaudible in some respects. The court has determined that the transcript introduced as Plaintiff's Exhibit 149 correctly sets forth the audible portions of the conversation. The court will discuss in more detail below the content of these conversations, and the circumstances of taping them.

The court indicated above that it will not place much credence in things said or done by Dr. Farrell during 1985 and will, reluctantly, now discuss the reasons for this conclusion. At the trial, the court excluded from the courtroom all persons except court personnel, and the parties and their attorneys, and received the testimony of Dr. Timothy Moritz, a psychiatrist with Charter Vista Hospital in Fayetteville. The court excluded the public from such portion of the trial in an attempt to do as little harm as possible to the memory of Dr. Farrell and to his family. With that same desire, the court has considered excluding from this memorandum opinion any discussion of what that testimony and the medical records received revealed in relation to Dr. Farrell's condition at the time that most of this was taking place, including the secretly made tape recordings. The court has reluctantly concluded that it is impossible to adequately explain why it has ruled as it has without some explanation of the medical evidence. The court intends to discuss the evidence only to the extent that it believes to be absolutely necessary. A complete picture of the medical condition of Dr. Farrell can be gleaned from Defendants' Exhibits 73, 74, 75, 76 and 77 (all held under seal of the court) and the testimony of Dr. Moritz given at the trial.

This evidence indicated that Dr. Farrell, in his mid–50s at the time, began to experience anxiety, depression, insomnia, and difficulty with concentration approximately two years before July of 1985. He admitted himself to Menninger Clinic in Topeka, Kansas, from September 17, 1984, through October 9, 1984. At that time, according to the medical records, he reported "depressed mood, suicidal ruminations, profound insomnia, agitation, and stated that he spent most of his nights pacing about unable to rest." During that time, he was treated with twelve bilateral ECT treatments (shock treatments). According to the records, prior to these treatments he showed some disruption in the sense of time. After the shock treatments, according to the medical reports:

> He showed some disruption in the sense of time. After ECT, he showed manifest time confusion. He showed some disruption in his ability to concentrate and in memory testing. He had difficulty remembering what happened to him only a few moments or hours previously. His depression improved following ECT, but he still manifested tremendous anxiety, as well as some organic features with impaired memory, confabulation, and confusion.

Dr. Moritz testified that by "confabulation" psychiatrists mean that if a patient can't remember something, he just "makes things up to fill in the blanks." The Menninger report also diagnoses Dr. Farrell as having problems with "abstract conceptual reasoning." Dr. Moritz said that that means the patient did not understand why others are doing what they are doing. In other words, he said, it means that the patient doesn't know the solution to the problem even if it is pointed out to him.

In a report dated November 28, 1984, from Dr. Stephen E. Katz, a psychiatrist at Menninger's, it was reported that Dr. Farrell had "a tendency to confabulate to fill in the gaps and that his recent memory was quite distorted." The report goes on to state that discussions with Dr. Farrell about "when things occurred and how long he was involved with them ... tended to vary from one day to the next."

On July 1, 1985, the day before the first surreptitiously recorded conversation with

Adella Gray, Dr. Farrell was given a Minnesota Multiphasic Personality Inventory Test by Dr. James N. Butcher. Significant to the issues in this case, the report reflects that "[h]e has diverse interests that include aesthetic and cultural activities. He is usually somewhat passive and compliant in interpersonal relationships, is generally selfcontrolled, and dislikes confrontation. He may have difficulty in expressing anger directly and may resort to indirect means."

Under "INTERPERSONAL RELATIONS," the report, in words that are particularly meaningful to this court in view of the claims made by Ms. Gray in this case, states that:

He appears to be quite passive and dependent in interpersonal relationships and does not speak up for himself even when others take advantage. He avoids confrontation and seeks nurturance from others often at the price of his own independence. He forms deep emotional attachments and tends to be quite vulnerable to being hurt. He also tends to blame himself for interpersonal problems.

Dr. Moritz testified in relation to notes that he made after meetings with Dr. Farrell or telephone calls from him. His notes indicate that on July 23, 1985, the very day of the secretly made tape of the telephone conversation with Adella Gray, Dr. Farrell reported to him that he had increased anxiety over the last few days and that he had severe insomnia. The next day, on July 24, 1985, or in fact the night after the telephone conversation with Adella Gray on July 23, he called Dr. Moritz at 7:30 a.m. at home and reported to Dr. Moritz that it was "his worst night ever." He told Dr. Moritz that he woke up with a severe panic about 2:30 a.m. (the very night after the telephone conversation) and was unable to sleep despite medication at 2:30 a.m. and 5:00 a.m. Dr. Moritz testified that it was unusual for him to receive a call at home from Dr. Farrell at all, but especially that early in the morning.

Dr. Moritz said that Dr. Farrell had a fear of an inability to perform on the job and that he could not say no to the demands of others. He was eager to please everyone. While it appeared during his testimony that Dr. Moritz was reluctant to make definite statements about things that he could not scientifically prove, he testified that there would be grounds to be concerned about the reliability of any statements he might have made because of his loss of memory, confabulation, and desire to avoid confrontation. He did testify without any hesitation that Dr. Farrell was "a very sick man on that day," referring to July 23, 1985, the date of the taped telephone conversation with Adella Gray. The record reflects that Dr. Farrell's serious mental illness culminated in him taking his own life in April of 1986.

As already indicated, the court does not intend to place much, if any, credence in what Dr. Farrell said or is claimed to have said during the month of his severe illness, or much significance in what he did. The testimony is that Coach Broyles tried to help Dr. Farrell recover by allowing him to at least believe that he was continuing to do the things and carry out the functions that he had carried out for years at the University of Arkansas Athletic Department. Broyles indicated that, after a certain point at least, they tried to double-check the things that he did. It goes without saying that they could not control what he said.

At the trial, Ms. Gray appeared to place considerable emphasis on the taped conversations with Dr. Farrell. It is noted by the court that in the submissions made by the attorneys, her attorney has appeared to not rely as heavily on these conversations as was indicated at the trial. Perhaps this is because of the court's indication at the trial of the serious question that it had about the reliability of the statements for several reasons. In the first place, as the court indicated at the trial, it has difficulty with the reliability of any surreptitiously made recording. The reason for that is that many people, if not most of us, can be led into saying almost anything that the questioner desires that we say, especially if we believe that by agreeing with him, we will

"get rid of him." It is for this reason that this court has expressed on more than one occasion the belief that the trier of fact should seriously consider the credence to be given to any surreptitiously made recording. The court simply believes that, even if the interrogated person has no mental disability, there is serious question about the reliability of statements made, especially when the interrogator chooses a path before the interrogation starts, and leads the unwitting person being interrogated down that path. In the court's view, it simply isn't "fair."

A reading of the two transcripts made from the tapes that Adella Gray made in this case vividly show why the court has this concern. In the July 2 conversation it is obvious that Lon Farrell believed that he was having a friendly conversation with Ms. Gray, not knowing that, all the while, she had a hidden tape recorder running in her briefcase. The very first question by Ms. Gray on the July 2 transcript is: "In thinking some more about this situation—do you—which one do you think really wanted a man? Was it Kenny?" Farrell's response was: "Yeah, oh yeah, Frank doesn't care." Then after Gray said: "You don't think he cared?" Farrell replied: "He couldn't care 1%. As long as things are going smooth Frank ... as long as things are smooth." Farrell then tells Gray: "You don't have to tell him I said that...." The court does not believe that, by any stretch of the imagination, Farrell said, during that conversation, that either Frank Broyles or Ken Hatfield wanted a man for the job. Adella Gray said that, not Lon Farrell.

Then, on July 23, 1985, a day on which Dr. Moritz said Dr. Farrell was "a very sick man," and the day before he woke up in a state of panic, Adella Gray carried on a friendly conversation with him, with her tape recorder running. In that conversation she learned that he had seen a psychiatrist in Oklahoma and that he was to see a psychiatrist at Charter Vista the next day. She should have been aware that he had severe problems because he reported to her that "I wake up in a panic about 3:00 or 4:00 in the morning. Sweating and shaking so bad and then by the time I get calmed down why the night's over—it's time to get up." In spite of this, the transcript indicates, without question in the court's view, that Adella Gray, after three pages of "friendly conversation," attempted to lead him down the path that she had already chosen, unbeknownst to him. This might have worked, as the court has already indicated, with a person that did not have a severe mental illness at the time, and it worked to some degree with Dr. Farrell, although the court, as will be indicated below, does not believe that he said what Ms. Gray has attempted to convince the court that he said. The conversation was, after Ms. Gray commisserated with him about having so much responsibility:

| | |
|---|---|
| GRAY | Yea. So, so Kenny had Jerry in mind from the very beginning, didn't he? |
| FARRELL | Uh, Kenny you mean? |
| GRAY | Yea. |
| FARRELL | I kinda think he did. But uh, I wouldn't swear, he may have considered somebody else, you know. Don't know how he did it, you know. |
| GRAY | Yea. |
| FARRELL | But his recommendation from the start was ah, Jerry, you know. |
| GRAY | Yeh—But he never, but he definitely wanted a man? |
| FARRELL | He wanted a man, yeh. |
| GRAY | But he never would get, that's what I can't understand, and that's what the players, you know, even have said, you know, Mrs. Gray— |
| FARRELL | He wanted somebody to go up there and jack em out of bed and that's all he ever said. |
| GRAY | But you know if— |
| FARRELL | And he never did really say anything negative about you. |
| GRAY | He just wanted somebody to, well, you know—if he could have just—if he'd ever just given me a chance. |
| FARRELL | I know what you mean Adella—ah—you know I know what's going on—It's a strange world of athletics—uh. |
| GRAY | Yeh. |
| FARRELL | Yeh, they act so impulsively sometimes. |
| GRAY | Yeh, and you know that's what was so shocking about it was that, you know, the spring, I mean, if it had happened last spring, you know, before we had worked together a while—back uh, then last summer, you know, we reevaluated all this stuff and he never once said anything to me about discipline. You know uh—I just, I just uh, you know, still can't understand, why he why he wouldn't give me a chance to do it. |
| FARRELL | Well I can't answer that you know. |
| GRAY | Yeh. |
| FARRELL | You and I have talked many times—bad situation—another problem— |

GRAY Yea. Well, uh, okay, I'll just talk to you later.

FARRELL All right.

Again, it is obvious to the court that Lon Farrell did not say "he definitely wanted a man"—Adella Gray did. Farrell seemed to at first agree by saying "he wanted a man, yeh," but ended by saying "he wanted somebody to go up there and jack em out of bed and that's all he ever said." The court believes that any fair reading of that exchange would be that Adella Gray attempted to lead Lon Farrell into saying that Ken Hatfield wanted a man, but he ended by saying that all he ever heard him say was that he wanted someone to "jack em out of bed."

In any event, for the reasons already stated, the court will not place any credence in what Ms. Gray claims Lon Farrell told her or the tape recordings surreptitiously made.

On July 8, 1985, Adella Gray filed a charge of discrimination with the Little Rock office of the Equal Employment Opportunity Commission and amended the charge on July 26, 1985. She received a right to sue letter on February 5, 1986, and her complaint in this lawsuit was filed on February 26, 1986.

## APPLICABLE LAW

The court is convinced that the applicable test to be applied in this case is enunciated by *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Plaintiff has argued that the *McDonnell-Douglas* formula is inapplicable because she proved by direct evidence that the defendants acted with discriminatory motive, citing *Clay v. Hyatt Regency Hotel,* 724 F.2d 721, 724 (8th Cir.1984), and *Lee v. Russell County Bd. of Education,* 684 F.2d 769, 774 (11th Cir.1982). Plaintiff fails to point to the evidence that she believed was the direct testimony proving the discriminatory motive and intent, but the court assumes that she has reference to the statements that she alleges Lon Farrell made, discussed above. For the reasons stated, the court

believes that, even if Dr. Farrell's statements were taken at face value, he did not say what Ms. Gray would have the court believe he said. In any event, the court does not believe that any credence should be given to the statements of an obviously sick man, for the reasons disclosed in the medical records. Thus, the court is convinced that the *McDonnell-Douglas* test is applicable to this case.

Since *McDonnell-Douglas Corp., supra,* trial courts and courts of appeal have had a great deal of difficulty determining which side in a lawsuit has the burden of proof and when that burden is carried. However, after the *Burdine* case, *supra,* and other cases following it, the law seems to be well settled, although its application is not as certain. Those cases hold that the plaintiff must first prove a prima facie case of discrimination. After that burden has been met by the plaintiff, the defendant then bears the burden of going forward with the evidence. The defendant's burden is to "articulate a legitimate non-discriminatory reason" for its actions. *McDonnell-Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. at 1824.

■ When the defendant meets his burden of going forward with the evidence in this respect, the plaintiff must then have the opportunity to establish that the evidence presented by the defendant was in fact a "pretext." *Texas Dept. of Community Affairs v. Burdine, supra.*

Because this court has been concerned about the substance, or lack thereof, of some of the reasons given for Ms. Gray's termination, it has attempted to discern from the cases where the matter stands if the plaintiff is able to convince the court, or the evidence convinces the court, that the reasons given are not very substantial. In other words, it might be argued that a wooden application of the *McDonnell-Douglas* test would result in the plaintiff winning if, after the plaintiff proves a prima facie case, the court has doubt that the reasons given by the employer are "good ones." What if the court, after hearing the employer's "reasons" and the employee's

rebuttal, believes that no one should be fired for those reasons? Does that mean that the reasons given are pretextual? A less than careful reading of *Burdine, supra,* might lead to that conclusion. After all, 450 U.S. at 256, 101 S.Ct. at 1095 the Court said:

> She may succeed in this [proving discrimination] either directly by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly by showing that the employer's proffered explanation is unworthy of credence.* (emphasis supplied)

After reviewing the cases, the court is convinced that plaintiff does not necessarily win even if the court is not convinced of the soundness of the reasons given or even if the reasons given are false. *See Tye v. Polaris Joint Voc. Sch. Dist. Bd. of Educ.,* 811 F.2d 315, 319 (6th Cir.1987). The actual burden of proof never shifts to the defendant. As the court said in *Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095:

> The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.

In other words, after all the evidence is in, the court must believe that, more likely than not, plaintiff was terminated because of her sex. If the court does not believe that the preponderance of the evidence shows that, plaintiff loses since she has the burden of proof.

In short, plaintiff does not win simply by showing that the proffered reasons are without foundation. Plaintiff must further show that these reasons were pretextual and given only to hide the true reason of termination because of sex. Pretext doesn't simply mean that the reasons given are wrong or false. Webster's New Collegiate Dictionary defines "pretext" as "a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs."

Larson on *Employment Discrimination* says that, in order for the employee to carry the burden of proving pretext, it must be proved "that the reason given by the employer was not legitimate and non-discriminatory, but was 'pretextual,' that is, a sham to cover the real discriminatory motivation." 2 Larson, *Employment Discrimination,* § 50.10 at 10–3 (citing cases, including *Loeb v. Textron, Inc.,* 600 F.2d 1003 (1st Cir.1979), and *Sweeney v. Board of Trustees of Keene State College,* 604 F.2d 106 (1st Cir.1979)).

In *Loeb, supra,* at 1012 n. 6, the court said:

> While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason must be reasonably articulated and nondiscriminatory, but does not have to be a reason that the judge or jurors would act on or approve. Nor is an employer required to adopt the policy that will maximize the number of minorities, women or older persons in his work force. *See Furnco Construction Co. v. Waters,* 438 U.S. 567, 576–77 [98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957] (1978).

In *Sweeney, supra,* at 112, the court said:

> We fully agree that the issue is not whether Sweeney was qualified for promotion or should have been promoted in 1974–75 by some objective measure, but whether she was denied a promotion because of her sex. *Loeb,* 600 F.2d at 1014. The recommendation of the 1974–75 FEAC is entitled to stand even if it appears to have been misguided, unless it was sex based. *Loeb,* 600 F.2d at 1012 n. 6, 1014.

Thus, the law clearly is that it is not sufficient in this case for Adella Gray to show that the reasons given by the University for her termination were "not good ones." She unquestionably also has the burden of proving sex discrimination by a preponderance of the evidence.

The Court of Appeals for the Third Circuit, in *Porter v. American Export Lines, Inc.*, 387 F.2d 409, 411 (3d Cir.1968), defined "preponderance of the evidence" as follows:

> It would doubtless be more comprehensible to a jury if they were told, as Professor McBaine has suggested in his thoughtful essay on the subject, that the plaintiff's burden is to convince them upon all the evidence before them that the facts asserted by the plaintiff are more probably true than false (citing cases). This, we think, is the intended effect of the "preponderance of the evidence" rule and it would place the emphasis upon the nature of the function which the jurors are being asked to perform and the degree of belief which must be produced in their minds before the plaintiff is entitled to a favorable finding for them.

Of course, in a Title VII case the court is the "jury."

In jury cases in state courts in Arkansas and in diversity cases in Arkansas, jurors are often given Arkansas Model Jury Instruction 202 which, the court believes, succinctly and clearly sets forth the plaintiff's burden in any case where the plaintiff has the burden of proving a particular proposition by a preponderance of the evidence. The last sentence of that jury instruction says: "If, upon any issue in the case, the evidence appears to be equally balanced, or if you cannot say upon which side it weighs heavier, you must resolve that question against the party who has the burden of proving it."

 In summary, the court believes that the law is that plaintiff first must carry the burden of establishing by evidence a prima facie case of discrimination. After she has done that, the burden of production of evidence (not the burden of proof) shifts to the defendant to articulate legitimate nondiscriminatory reasons for the action taken. After the defendant does that, the burden of production shifts back to the plaintiff to persuade "the court that she has been the victim of intentional discrimination." *Burdine, supra*, 450 U.S. at

256, 101 S.Ct. at 1095. If, after viewing all of the evidence, the court does not believe that, more likely than not, plaintiff was terminated because of her sex, then she loses. If, after viewing all of the evidence, the court cannot say upon which side it weighs heavier, plaintiff still loses because she has the burden.

## DISCUSSION AND CONCLUSIONS

██ This court is convinced that the *McDonnell-Douglas* test, and the cases interpreting it, are not a great deal of help in searching for the "truth" in a case such as this. The court says that because, in the court's view at least, those cases seem to assume that an employer who makes employment decisions can list the reasons for that decision in clear, succinct and meaningful expressions, and, in fact, the law appears to require that. Those cases seem to assume that employment decisions can be "formulaized" and once all the factors are placed in the formula, a crank can be turned and a proper result reached. Anyone who has made these decisions in the "real world" realizes that it is not quite that simple. Any employer who has ever had to make these unpleasant decisions undoubtedly knows that there are many reasons why "the boss" desires that a certain person not work for him or her any longer, or that a certain person work for him or her. Many times, this decision is based on no more than a "feeling," and it is difficult, if not impossible, to list the reasons. The "boss" simply wants someone else working for him or her. The court believes that the law ought to be and is that an employer still can choose who works for him or her based on a "feeling" or for any other reason that is not made impermissible by law.

In this case, the court was initially troubled by the seeming lack of depth of some of the reasons given by Ken Hatfield for plaintiff's termination. For example, at first blush at least, the "Kingsby incident" is almost laughable. The court's first reaction is "do adults really stand around anxiously waiting for the grades of a 19-year-old to be posted in a demanding course of study which includes Beginning Canoeing,

Beginning Raquetball, and Furniture Finishing?" Do such adults think that it is a legitimate ground to terminate an employee because that employee is not also standing there with bated breath?

However, after giving the matter further consideration, and after considering the circumstances which exist in "big time football," the court can understand that that is not as incredulous as it at first sounds. Whether that is the way that it ought to be or not, football in major football colleges is about as important as anything that occurs there. The entire livelihood of the football coaches and their staff and, in fact, their very professional existence, depends upon whether they win, appear on television, go to a bowl, satisfy their fans, and bring home "big bucks." If they don't win, they don't keep their job. The fact is that the recruitment of an outstanding 18–year–old athlete, and his continued eligibility to play, can literally determine the success or lack thereof of a football coach. As Coach Broyles pointed out, the ineligibility of Eddie White through the foul-up discussed above undoubtedly had some effect (although it is difficult to say how much) on the football program that year and on the lack of success that Coach Holtz had in his last year on campus. The court hastens to say that it is not finding, by any stretch of the imagination, that that's the way it should be, only that that is the way it is.

Thus, the court cannot even say that the Kingsby incident was not a "good reason" in the mind of Coach Hatfield at the time and place that it occurred, and can certainly not say that it was pretextual, given only to cover up and hide the real reason for his desire to terminate Ms. Gray.

The court is convinced, after viewing the evidence as a whole, that Adella Gray has failed to carry her burden of convincing this trier of fact that, more likely than not, she was terminated because of her sex. The court believes that the reasons given, as delineated above, for her termination were not pretextual. The fact that they may not be "very good" is not sufficient. This court must believe, and it simply does not, that they were not only "not good

reasons," but that they were given to hide the true state of affairs.

The court is convinced that at the time that Ken Hatfield made the decision to terminate Ms. Gray, he did so because he was not comfortable with her and wanted someone else in the job. As Coach Broyles testified, the academic coordinator position was considered by the Athletic Department to be at least akin to the coaching staff of the football coach. Under the system, he has a right to choose the persons that work for him on that staff and, so far as the law is concerned, he may do so so long as the reasons for such decision are not impermissible under Title VII or some other applicable statute.

Plaintiff called a number of ex-football player witnesses who mostly said "yes sir" to a litany of leading questions about Ms. Gray's capabilities as an academic counselor. Those ex-players seemed to believe that she was a good one. In addition, a number of faculty members testified, in essence, that she did a good job and was not "hard to get along with." However, the question is not whether Adella Gray was doing a good job or a bad one, but simply whether she was terminated because of her sex. The question is not whether Ken Hatfield and the Athletic Department run a good program or a bad program. Under the law, they have the right to run whatever program they desire to run so long as, in making the decisions in respect to the running of that program, they do not discriminate because of race, sex, age, or some other proscribed reason.

Not only does the court find that plaintiff has failed to carry her burden of proving that she was discriminated against because of her sex, the court finds that there is abundant evidence to support defendants' argument that the action was taken for nondiscriminatory reasons. As already indicated, the court believes that Ken Hatfield had a "feeling" that he did not want Ms. Gray working for him any longer, and, while the reasons might not be exceptionally important in the eyes of someone not filling his shoes, the court cannot say that they were pretextual. In addition, there

was testimony to support the reasons given by the University. Daniel E. Ferritor, now Chancellor of the University of Arkansas, and then a professor of sociology and chairman of the department, obviously did not want to say anything "bad" about anyone, but he said that he had asked more than one other person if they could not get Ms. Gray to "nice up."

The court has already discussed the testimony of Dr. Don White, Chairman of the Management Department in the College of Business Administration, about the "Derrick Thomas incident." In addition, Dr. White testified that he was not happy with the allegations which Adella Gray made in relation to the Kevin Wyatt incident. In this respect, Dr. Charles Hubbard, Associate Dean of the College of Business Administration, testified that after a meeting with other associate deans and members of the Athletic Department, while on the way to the parking lot, Adella Gray told him that she had a problem that she needed to discuss with him. He told her that he didn't have time to discuss it with her at that time, but she seemed to think it was important. She said that his department had misadvised athletes in relation to the courses that they took. Hubbard became angered about this and went to her office with her and insisted that she "put it in writing." Hubbard insists that the incident was not the fault of personnel in his department. In the court's view, this supports Hatfield's belief, whether it be right or wrong, that Ms. Gray had a tendency to blame others for her mistakes.

Othelia Paul, an employee of the College of Education, with duties to evaluate all transfer work of transfer students and work out a degree plan, testified that she resented the manner in which Adella Gray demanded that she perform functions for the Athletic Department. It was obvious that Ms. Paul, again not a person who readily criticized others, was not objecting to the demands made by Ms. Gray, but the manner in which they were made.

Anne Murphy also testified and it was obvious to the court that she did not like Adella Gray, and for this reason, the court will not place a great deal of credence in her testimony. However, she did believe, whether right or wrong, and whether it was her fault or Ms. Gray's fault, that Adella Gray was "unreliable, inconsistent, and I just didn't trust her." Again, whether this was witness Murphy's fault or Ms. Gray's fault, the fact is that she reported this disagreement to the Athletic Department personnel, and it certainly supplies some basis for Ken Hatfield believing as he did, even if it is assumed for sake of argument that it was based upon the biased input of Ms. Murphy.

In her proposed findings of fact, plaintiff pointed to numerous factors that she believes should indicate to the court that she was discriminated against by the Athletic Department because of her sex. The only one of these factors which gives the court any pause is her argument that evidence of the Athletic Department's failure to live up to the University of Arkansas' affirmative action program is evidence of discrimination. *See Taylor v. Teletype Corp.*, 648 F.2d 1129, 1135 n. 14 (8th Cir.1981), and *Craik v. The Minnesota State University Board*, 731 F.2d 465, 472 (8th Cir.1984). It is true that the Court of Appeals, *en banc*, in *Craik, supra,* a class action sex discrimination case, held that all of the evidence which tended to show discrimination was relevant and should be considered together. One of the pieces of evidence that the court believed that the trial court should have considered was that the employer had failed to live up to an affirmative action plan. The court stated that: "The magistrate's near complete failure to address the evidence concerning the defendants' affirmative action efforts reduces our confidence in his ultimate conclusion." That court does not say that the court must, in all cases, make findings of fact in relation to compliance with an affirmative action program, but, instead, only holds, in this court's view, that that is one of the pieces of evidence that the court must take into consideration.

This court believes that that evidence is more relevant in a class action case, but has considered whether the University complied with the affirmative action program,

along with all of the other evidence, in determining whether it believes that, more likely than not, Ms. Gray was discriminated against because of her sex. The court finds that the evidence shows that the program was substantially complied with in most respects in most of the hirings which took place during the relevant period. It is true that it apparently was not complied with when Ms. Gray was hired, but she does not appear to complain about that. The evidence in that respect is that she created the job that she sought, and then got it, apparently with little attempt by anyone to comply with the program. After that, however, Lon Farrell was responsible for seeing that the Athletic Department complied, and it appears that he, in every case, prepared an advertisement and circulated it in the manner contemplated by the plan. It is true that in most, if not all, cases the person responsible for the decision contacted a person that he felt was especially qualified and asked that person to apply. When Jerry Welch was hired, Hatfield not only asked if he was interested, but also contacted Major Ellis of the Air Force Academy. The court does not believe that there is "anything wrong with that" or that it violates the affirmative action plan in force at the University at the time. The plan obviously contemplates that the University will see that a broad cross-section of individuals know about a job opportunity, but it does not intend to require the employer to interview all or any of the applicants. The University, under the plan, has the right and, in fact, the obligation to hire the best person available. It is not a violation of the plan to contact persons that the hiring entity believes are especially qualified for the job, and ask that that individual apply. That appears to have been done in this case, but the court does not believe that it is a violation of the affirmative action plan.

It is true that the plan also requires that the University employer periodically evaluate employees, and it appears to contemplate that this be done in writing. This was not done in Adella Gray's case. Coach Broyles testified that he and others in the department considered everyone in the department to be "family" and he expected and others expected that they do their job. This was evidenced by the fact that Adella Gray, and apparently others, were permitted to set their own work schedule and to schedule their own vacations. The court has considered this failure by the Athletic Department to strictly comply with the affirmative action plan, and believes and decides that it had absolutely nothing to do with Adella Gray's eventual termination. Thus, the court has considered this piece of evidence, along with all of the other, and has determined that it does not tend to show to any degree that Adella Gray was terminated because of her sex.

In any case such as this, the trier of fact is unavoidably affected by what occurs during the trial, and credibility determinations are often made on the basis of not only the demeanor of witnesses while on the witness stand, but the way the evidence develops, and the manner in which it is presented. In this case, the court was affected by two things that took place during the presentation of Adella Gray's case. First, the court was concerned about the fact that Ms. Gray surreptitiously recorded conversations with Lon Farrell, who she should have known, and the court believes knew, was a sick man. She professed to have a great deal of respect for Dr. Farrell's honesty and integrity, but when the court asked her, if that was a fact, why she didn't simply go to him and say "Lon, you know what they're doing to me, will you help me?" Her reply was that she thought that that would place more strain on him than the course she followed. The court wondered at the time, and now wonders, whether that explanation "holds water." The court believes that Ms. Gray might have at least suspected that disclosure of the surreptitiously recorded conversation at the trial would have had a devastating effect on a sick man had he lived until the trial, and, of course, when the tapes were made, Ms. Gray had no reason to know that he wouldn't. It would certainly have "put pressure on him" to hear the friendly conversation that his friend secretly recorded.

The matter that gave the court the most concern in relation to credibility was the content of and the circumstances of the preparation of the document which was introduced as Defendants' Exhibit 71. During Ms. Gray's testimony, defendants' counsel asked for production of the notes that she had testified that she made immediately after her May 20, 1985, conversation with Coach Hatfield. The photocopy on 8½″ by 14″ paper in the file marked as Defendants' Exhibit 71 was produced by her attorney in response to this request. While plaintiff was being questioned by counsel, the court noted that some of the entries appeared to be in either lighter or darker print than adjoining entries. The court then asked for the original copy of the notes, and plaintiff's counsel replied that the photocopy introduced was what Ms. Gray had given him. Ms. Gray was asked to produce the original, and she left the witness stand and went to counsel table and removed from her personal effects the original copy of the notes which is in the file as a portion of Defendants' Exhibit 71, on the yellow sheets of paper. It became obvious during a cursory examination of this that the photocopy initially produced by her was the result of a "cut and paste job." It is obvious that the original has been cut apart and pasted in various ways. In addition, as the court indicated to Ms. Gray at the trial through questioning, it appears that some of the more damaging statements which she attributes in the notes to Coach Hatfield were made at a time subsequent to the writing of the initial notes, sometimes even in a different colored ink. For example, the second page of the photocopy initially produced is numbered as page 2, but it is on the back of page 1 of the handwritten notes and is numbered "1a." In addition, the words "sit on their bed" on that sheet are obviously written in black ink, when the remainder of the notes are written in blue ink. That, of course, is significant language, and Ms. Gray explained that, as the court recalls, by saying that she thought of it later and just happened to pick up a pen with a different colored ink. Also, some of the more damaging statements alleged to have been made by Hatfield were obviously added by interlineation. For example, on the first page of the notes the words "more physical person" have been written above the line, apparently at a time subsequent to the making of the major portions of the notes.

When the court asked Ms. Gray why she cut the original notes apart and pasted them back together in various orders, her explanation was that she did that to get it to fit into a copy machine. The court noted, however, that the page which she has numbered page "3a" in her original notes is taped together in such a way that it makes a sheet that is considerably longer than "legal size," and even longer than any paper used in any standard copier of which the court is aware. It is also obvious that a change has been made in the page numbers on pages 4 through 7. To make matters worse, Mr. Lavey, plaintiff's counsel, produced another photocopy, the third set in Defendants' Exhibit 71, which, in some respects, at least, is copied in a different order than the first one.

There are other things about this exhibit that caused the court concern in relation to credibility. In addition to the entries made on the back of sheets and in different colored ink already referred to, there are other examples of this throughout the document. The court would not be as concerned about that if it were not for the fact that these entries seem to be the most damning from the defendants' standpoint.

The court believes it to be significant that it gave counsel an opportunity to question Ms. Gray about this exhibit after the court pointed out the concerns that it had, and Ms. Gray's counsel chose not to do so.

Based on all of the factors, the court must conclude that the "cut and paste job," the change in numbering, and the additions made in different colored ink, were done to present the evidence in the light which Ms. Gray felt to be most favorable to her in the event that it was introduced into evidence. This causes the court to at least "wonder" about Ms. Gray's credibility, not only on this issue, but in relation to other "facts" to which she testified.

In conclusion, the court finds that, although Ms. Gray met the first portion of the *McDonnell-Douglas* test, based on all of the factors discussed, and all of the evidence presented, the court believes that plaintiff has simply failed to carry her burden of proving by a preponderance of the evidence that she was terminated and otherwise discriminated against because of her sex. The court, after viewing the evidence as a whole, simply cannot say that it believes that, more likely than not, this is the case. Instead, the court believes and finds that Ken Hatfield terminated Ms. Gray because he desired to have another person in the job with whom he would feel more comfortable and that the reasons given by him were not pretextual. Ms. Gray's sex played no part in such decision, or at least she did not meet her burden of proving that it did. For these reasons, the court finds that the plaintiff should take nothing on her complaint and that this matter should be and it hereby is dismissed with prejudice.

A separate judgment in accord with this memorandum opinion will be concurrently entered.