Adella D. GRAY, Appellant,

v.

**UNIVERSITY OF ARKANSAS AT FAY-ETTEVILLE and the Board of Trustees of the University of Arkansas, Appellees.**

No. 87–1645.

United States Court of Appeals,
Eighth Circuit.

Submitted March 16, 1988.

Decided Aug. 25, 1989.

Rehearing En Banc Denied Nov. 7, 1989.

Ginger P. Crisp, Fayetteville, Ark., for appellees.

Before McMILLIAN, WOLLMAN, and BEAM, Circuit Judges.

WOLLMAN, Circuit Judge.

Adella Gray brought this Title VII action against the University of Arkansas (University), claiming that she had been terminated from her position as academic coordinator for the Arkansas Razorbacks because of her sex. The district court[1] found in favor of the University. *Gray v. University of Arkansas,* 658 F.Supp. 709 (W.D. Ark.1987). On appeal, Gray contends that the court (1) abused its discretion when it declined to recuse; (2) erred in determining that she had not presented credible direct evidence of discrimination; and (3) incorrectly applied the Title VII law of pretext. We affirm.

I.

After eleven football players flunked out of the University in May 1981, Gray, who had experience working with students on academic probation, proposed to head basketball coach Eddie Sutton and head football coach Lou Holtz that she design a program for the athletic department to help student athletes to achieve academic success. Although the dean of the College of Education expressed reservations about hiring Gray because he felt that she was "too pushy" and did not have good relations with the University faculty, Frank Broyles, the athletic director, hired Gray based on his policy of following the coaches' recommendations. Beginning on March 15, 1982, Gray assisted in recruiting, conducted orientation for incoming freshmen, operated the study hall, and provided tutors for the student athletes. Gray was also responsible for keeping the necessary records to ensure that the student athletes remained eligible under the National Collegiate Athletic Association (NCAA) rules. She advised athletes on their course of

John T. Lavey, Little Rock, Ark., for appellant.

---

1. The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

study and served as liaison between the coaches and the faculty. As a nontenured faculty member, Gray was terminable at will.

In May 1983, Gray asked an English instructor, who was also an athletic tutor, to change the grade of an athlete in his English class from a "D" to an "Incomplete." During the conversation, Gray expressed the hope that the instructor could be employed again the following year as a tutor. The instructor interpreted Gray's remark as a threat that the athletic department would not rehire him if he failed to comply with Gray's request. After being informed of the incident, the chairman of the English department wrote Broyles to express his anger at and frustration with Gray's request. Broyles responded that Gray's request was improper and that he had given Gray a copy of the letter to remind her of his policy.

In August 1983, Eddie White, who was expected to be the starting end of the football team that season, was declared ineligible because he had taken the same course twice. The error was discovered too late for White to take additional hours in summer school. Although someone else was responsible for the certification, Gray acknowledged that she should have caught the error. White's ineligibility was embarrassing to the athletic department and detrimental to the team's offensive strategy. Broyles testified that Holtz called a staff meeting and "went into rages." TR 3 at 4. Gray's recollection of the incident was that Holtz "just simply said that it was unfortunate." TR 3 at 145.

Holtz' team won only five games that season, and on January 1, 1984, Ken Hatfield succeeded Holtz as head football coach. Although Hatfield brought most of his own staff with him, he did not replace Gray, but instructed her to continue operating the academic program as she had done in the past. He informed his staff that players were responsible for their own actions, including going to class and working towards graduation. Larry Dixon, a volunteer football coach and dormitory counselor for the Razorbacks, was hired to a newly-created academic advisor position

that involved maintaining a degree check for compliance with new NCAA rules.

In February of 1984, an irate faculty member informed Hatfield that an athlete had turned in a paper written by a tutor. Hatfield testified that he informed Gray that they were not going to operate that way. Gray denied having the discussion and testified that she always told the tutors that they were never to do the athletes' work.

Gray's advice to students on course selection sometimes conflicted with advice that students received from faculty. Derrick Thomas, a sophomore, informed Hatfield that a professor in the College of Business Administration, Dr. Donald White, had refused to approve a senior-level course that Gray had recommended because Thomas had not taken two of the five prerequisites. Disturbed and angry, Dr. White informed Hatfield that it was inappropriate for the athletic department to advise students on course selection and that the role of the athletic department should be limited to checking that the courses students select fulfill NCAA requirements. Hatfield told Gray that he thought their credibility was destroyed with football players because Thomas would tell the players that Gray had advised him to take a senior-level course as a sophomore.

Another incident concerned Jim Kingsby, an outstanding defensive lineman for the Razorbacks who was placed on academic suspension in 1983. When Kingsby expressed an interest in returning to the University, Hatfield requested that Gray assist Kingsby with the courses he needed for readmittance. Kingsby needed to pass fifteen hours of summer school to be eligible. Having a cumulative grade point average of .9, Kingsby registered for Beginning Racquetball, Wood Finishing, Industrial Design I, and Beginning Canoeing.

Kingsby's grades were to be posted on Friday, July 13, 1984. Although Gray had scheduled her vacation to begin the following Monday, she decided to go on vacation earlier than planned and asked Dixon to cover the posting of Kingsby's grades.

When Hatfield discovered that Gray was not at school waiting for Kingsby's grades, he telephoned her and told her to return to the office because he wanted his best and most experienced academic coordinator available in case Kingsby failed some of his courses. As it developed, Kingsby passed all of his courses. Although Gray had returned to the office at Hatfield's request, he concluded that her decision to go on vacation earlier than planned was a disloyal act and decided that he no longer wanted her to be his academic advisor. When Gray returned from vacation, Hatfield placed Dixon in charge of the academic program, with Gray under his supervision.

On January 14, 1985, however, Hatfield returned full responsibility for the academic program to Gray. On February 15, 1985, the dean's office in the College of Business Administration notified Gray that three of Kevin Wyatt's fall 1984 classes would not count toward graduation. Hatfield did not become aware until May 1985 that Wyatt might not be eligible. Gray informed Associate Dean Charles Hubbard of the College of Business Administration that Dr. White had improperly advised Wyatt. This angered Hubbard because he felt that Gray was calling into question the capabilities of his advisors. Hatfield testified that Hubbard would not know the NCAA rules and that it was Gray's responsibility to check that student athletes complied with the rules.

In May 1985, Hatfield decided that he would recommend that Gray not be reappointed. He told Gray that he did not feel comfortable with the way she ran the academic program. Hatfield told Broyles that the reasons for his decision were that he and Gray did not have a good working relationship with faculty and that he was concerned about player ineligibility because of the White, Kingsby, and Wyatt incidents.

Hatfield then telephoned a former teammate, Jerry Welch, and asked him if he would be interested in applying for the position. Dr. Lon Farrell, the associate athletic director, prepared an advertisement for the position of men's academic counselor, which Hatfield asked him to send to Welch. After Broyles reviewed the applications of Welch and another applicant, he hired Welch based on Hatfield's recommendation. Welch's starting salary was $30,000, with additional compensation of $174 per month for supervising study hall. Gray's salary had been $21,780.

Farrell submitted a report of termination, written in pencil, to the Office of Human Relations, stating that "Coach Hatfield had received several reports from the faculty and administration that her [Gray's] public relations with them had not been good. We also need a person that * * *." Farrell later returned to the office to erase portions of what he had written and added the following: "can be a stronger disciplinarian and go into the dorm and awake athletes that are sleeping in." Plaintiff's Exhibit No. 138.

Gray filed a sex-discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) (1982). Applying the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the district court held that Gray had not shown by a preponderance of the evidence that she was terminated because of her sex.

## II.

Gray filed a motion for recusal, asserting that an appearance of impropriety existed because the trial judge had been a partner in the practice of law some five years earlier with a member of the Board of Trustees of the University, a party defendant. The district court denied the motion, concluding that this past relationship would not cause reasonable persons to believe that the court might be biased in favor of the University.

Under 28 U.S.C. § 455(a), a judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 2201, 100 L.Ed.2d 855 (1988). In making the decision whether to recuse, a judge must employ an objective standard of reasonableness. *See United States v. Poludniak*, 657 F.2d 948, 954 (8th Cir.1981), *cert. denied*, 455 U.S. 940, 102 S.Ct. 1431, 71 L.Ed.2d 650 (1982). Because

the goal of the statute is to ensure the appearance of impartiality, disqualification is required if a reasonable person who knew the circumstances would question the judge's impartiality, even though no actual bias or prejudice has been shown. *Id.* Gray contends that the perception of the average person on the street would be that former law partners and continued friends would be biased toward one another, giving the University an apparent advantage.

■ We review a judge's decision to decline to recuse himself under the abuse of discretion standard. *See Gilbert v. City of Little Rock,* 722 F.2d 1390, 1399 (8th Cir.1983), *cert. denied,* 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984). Because Judge Waters' former law partner was not expected to testify at trial, nor would a judgment be entered against him personally, we conclude that the trial judge did not abuse his discretion in declining to disqualify himself.

### III.

■ Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), it is an unlawful employment practice for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's * * * sex." A plaintiff may establish a prima facie case of sexual discrimination by presenting either direct or circumstantial evidence. Direct evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude. *See Hill v. Metropolitan Atlanta Rapid Transit Authority,* 841 F.2d 1533, 1539 (11th Cir.1988). In the absence of such direct evidence, a plaintiff may present evidence that she was qualified for the position, was discharged, and was replaced by a man with equal or lesser qualifications. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

Once the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the discharge. If the defendant succeeds in establishing a legitimate, nondiscriminatory reason, the plaintiff is given an opportunity to prove by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason but was a pretext for discrimination. *Watson v. Fort Worth Bank & Trust,* —— U.S. ——, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *West v. Swift, Hunt & Wesson,* 847 F.2d 490, 491 (8th Cir.1988).

■ If the plaintiff proves that gender played a motivating part in the employer's actions, "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account." *Price Waterhouse v. Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989). This second method of allocating burdens applies to the so-called mixed-motive cases—cases in which the employer had both legitimate and illegitimate reasons for its actions.

#### A. *Motivating Factor*

■ For a district court to find the existence of gender as a motivating factor, it must first find the evidence presented to be credible. *See Craft v. Metromedia, Inc.,* 766 F.2d 1205, 1211 (8th Cir.1985), *cert. denied,* 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *Thompkins v. Morris Brown College,* 752 F.2d 558, 564 (11th Cir.1985). Here, the district court did not accept Gray's evidence, which consisted primarily of two secretly tape recorded conversations with associate athletic director Farrell and her own testimony about what Farrell had said to her.

We review the district court's factual findings under the "clearly erroneous" standard, Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), and we construe the evidence in the light most favorable to the prevailing party. It is with that standard of review in mind that we turn, then, to the evidence concerning Farrell's mental health and the two conver-

sations with Farrell that Gray secretly tape recorded after she decided to file a sex discrimination suit.

On July 2, 1985, Gray returned to the University to clean out her office. Farrell brought in a resignation form, which Gray refused to sign. Before leaving, Gray hid a tape recorder in her briefcase, went into Farrell's office, and secretly tape recorded their conversation. The following dialogue took place:

GRAY  In thinking some more about this situation—do you—which one do you think really wanted a man? Was it Kenny [Hatfield]?

FARRELL  Yeah, oh yeah, Frank [Broyles] doesn't care.

GRAY  You don't think he cared?

FARRELL  (?) ... He couldn't care 1%. As long as things are going smooth—? —as long as things are smooth.

On July 23, 1985, Gray phoned Farrell at home and again secretly tape recorded their conversation:

GRAY  Um, just kinda trying to think back through this, when Frank [Broyles] first started talking to you about it, he was talking about Jerry [Welch], right?

FARRELL  Yep.

GRAY  Yea. So, so Kenny [Hatfield] had Jerry [Welch] in mind from the very beginning, didn't he?

FARRELL  Uh, Kenny [Hatfield], you mean?

GRAY  Yea.

FARRELL  I kinda think he did. But uh, I wouldn't swear, he may have considered somebody else, you know. Don't know how he did it, you know.

GRAY  Yeh.

FARRELL  But his recommendation from the start was ah, Jerry [Welch], you know.

GRAY  Yeh—But he never, but he definitely wanted a man?

FARRELL  He wanted a man, yeh.

GRAY  But he never would get, that's what I can't understand, and that's what the players, you know, even have said, you, know, Mrs. Gray—

FARRELL  He wanted somebody to go up there and jack em out of bed and that's all he ever said.

In addition to introducing the two tape recordings of her conversations with Farrell, Gray testified about various other statements Farrell had allegedly made to her. For example, Gray testified that when she asked for a graduate assistant to help her with clerical work Farrell told her that Broyles had said, "She's a woman, she can do her own typing." Gray acknowledged, however, that Farrell had been able to change Broyle's mind and that she then hired a work-study person to help with clerical work. Gray testified that Farrell told her that Broyles was unwilling to discharge her because she had done such an excellent job and that Broyles wanted to offer her $14,000 until she could find another job if she wanted to train the "new man."

The district court concluded that it would not place any credence in what Gray claimed Farrell had told her in person or in the surreptitiously-made tape recordings. In addition to questioning the reliability of surreptitiously made tape recordings, the court placed little weight in things said or done by Farrell because of the evidence regarding Farrell's mental illness.

Farrell was deceased at the time of trial, having committed suicide in April 1986. Dr. Timothy Moritz, a psychiatrist who had treated Farrell from August 23, 1985, until Farrell's death, described Farrell's condition as a complex and severe psychiatric illness having several different diagnostic components, including major depression, encephalopathy, and low-dose benzodiazophen dependence. The medication Farrell had been taking for his depression and anxiety caused memory and concentration problems, with more obvious types of confusion at times.

Medical records indicated that Farrell began to experience anxiety, depression, insomnia, and difficulty concentrating in 1981, when he was in his mid-fifties. He admitted himself to the Menninger Clinic in Topeka, Kansas, on September 17, 1984 through November 15, 1984, reporting that

he had become progressively more depressed and agitated over the past two years. Farrell underwent a series of twelve bilateral electrocompulsive therapy treatments (shock treatments) which exacerbated his confusion and memory problems. On June 28, 1985, Farrell admitted himself to the Presbyterian Hospital in Oklahoma City because of severe insomnia.

Dr. Moritz testified that Farrell showed an inability to say no to the demands of others and was very eager to please everyone. He further testified that without a doubt Farrell was a very sick person on July 23, 1985, the date of the second telephone conversation with Gray.

Gray argues that the record does not support the court's decision to totally disregard as unreliable anything Gray alleged that Farrell had said to her. Gray points out that Dr. Moritz testified that there was no evidence of hallucinations or delusions and that Farrell had scored in the normal range on a Wechsler Memory Scale. The University correctly points out, however, that a multitude of other psychological tests indicated that Farrell's memory was impaired and that he confabulated to cover up his memory loss. Gray also argues that Farrell continued to run the day-to-day operations of the athletic department during the time in question. Broyles testified, however, that although he did not fire Farrell because of their close personal friendship, he double-checked Farrell's interpretation of NCAA rules and any letter that went out under Broyles' name. Broyles and his staff had decided that they would let Farrell think that he was doing as much work as he had done before in order to give him every opportunity to overcome his depression.

The University contends that the credibility of Gray's testimony about what Farrell said to her is further called into question by her own admission that she planted in Farrell's mind the idea that Hatfield wanted a man. Gray's notes reflect that after

Hatfield had told her on May 20, 1985, that he needed a "stronger personality" who could go out and get the players to come in and see the academic coordinator, she embellished the conversation and told Farrell that Hatfield wanted to replace her with "a stronger, more physical person who can get them out of their room, to class, et cetera." Defendant's Exhibits No. 71 and No. 72. Farrell expressed surprise that Hatfield was planning to replace Gray, which indicates that Hatfield had not consulted Farrell about his decision.

Hatfield testified that he never told Farrell that he wanted a stronger or more physical person (as opposed to personality) who would get the players out of their rooms. On cross-examination, Gray admitted that Hatfield had not spoken to her about getting the players out of bed.

In the light of the inconsistencies between Gray's notes of conversations she had had and her testimony at trial about those conversations, we conclude that the district court did not err in not accepting as credible evidence Gray's testimony as to what Farrell had allegedly said to her. The district court also had reason to question Gray's credibility when it examined the original copy of Gray's notes of her May 10, 1985, conversation with Hatfield. Some of the most damaging statements were written in between the lines and in a different color ink, indicating that they had been inserted later.

As indicated earlier, to reap the benefit of the mixed-motive test a plaintiff must produce evidence that the court believes. *See Craft*, 766 F.2d at 1211; *Thompkins*, 752 F.2d at 564. Giving due deference to the trial court's opportunity to observe the demeanor and performance of the witnesses, *Anderson v. City of Bessemer City*, 470 U.S. at 575, 105 S.Ct. at 1511, we conclude that the court did not err in determining that Gray had not produced credible evidence of discrimination.[2] This fore-

---

2. We reject Gray's contention that evidence of salary disparity and the University's failure to live up to its affirmative action program is direct rather than circumstantial evidence of discrimination. We note in passing that Gray's appointment to the position of academic coordi-

nator was not effected in compliance with the University's affirmative action plan, and that Gray had requested that the University hire "an older, preferably black man" to help with study hall. TR 4 at 28.

closes the application of the mixed-motive analysis. The pretext analysis applies, as set forth in *McDonnell Douglas.*[3]

## B. *McDonnell Douglas Analysis*

Gray contends that the University failed to meet its burden of articulating a legitimate, nondiscriminatory reason for discharging her, and, alternatively, that the University's proffered rationale for her dismissal was pretextual. She argues that the district court incorrectly applied the law of pretext, pointing to the court's statement that: "After reviewing the cases, the court is convinced that plaintiff does not necessarily win even if the court is not convinced of the soundness of the reasons given or even if the reasons given are false." *Gray v. University of Arkansas,* 658 F.Supp. 709, 723 (W.D.Ark.1987). Gray contends that the court required her to prove discrimination by direct evidence.

█ An employer may meet its intermediate burden of production by articulating even an untrue reason for terminating a member of a protected class. *Tye v. Polaris Joint Voc. Sch. Dist. Bd. of Educ.,* 811 F.2d 315, 319 (6th Cir.), *cert. denied,* 484 U.S. 924, 108 S.Ct. 285, 98 L.Ed.2d 246 (1987). The plaintiff then has the opportunity to prove that "the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. *See also Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557, 559 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987); *Benzies v. Illinois Dep't of Mental Health & Developmental Disabilities,* 810 F.2d 146, 148 (7th Cir.), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987). An employer's articulated reason for terminating a member of a protected class need not be a sound business reason, or even a fair one. *West v. Swift, Hunt & Wesson,* 847 F.2d at 492. The only relevant inquiry is whether the decision was based on gender. *Id.*

The University presented two reasons for Gray's termination. First, the University introduced Hatfield's letter of termi-

nation to Gray, which stated that he wanted a tougher disciplinarian who could command the respect and dedication of all the players while developing a harmonious working relationship with faculty, staff members, and others on the campus. Second, Hatfield testified that he did not feel comfortable with Gray as his academic coordinator. Hatfield was concerned about player ineligibility and needed someone he could trust completely.

█ Subjective reasons for an employment decision are sufficient to rebut a plaintiff's prima facie case if they result from investigation into the employee's character and performance rather than simply emanating from the subconscious of the decision-maker without any sufficient basis. *Tye,* 811 F.2d at 320. Hatfield gave consistent reasons to back up his subjective feeling that he did not feel comfortable with Gray as his academic coordinator. The district court reasoned that considering the pressures of big-time college football, in which if a coach does not win he does not keep his job and in which the eligibility of a single player can determine a coach's success or failure, Hatfield had legitimate grounds for concern over the various incidents pointed out at trial. Hatfield's conclusion that he needed a person who could develop better relations with faculty was supported by the testimony of several faculty members to the effect that Gray was a demanding person and was inconsiderate of their time. Additionally, Hatfield acknowledged that a woman could do the job when he told Gray that he needed someone like the female academic coordinator at the University of Nebraska.

Gray contends that she was treated differently than her replacement, Welch, in several respects. The University responds that it articulated a legitimate explanation for each of the differences. Gray points first to the salary disparity between herself and Welch. Gray's salary was $21,780 when she was terminated, whereas Welch's starting salary was $30,000. Welch, how-

---

**3.** In view of our holding that Gray did not establish the existence of mixed motives, we need not decide to what extent our holding in *Bibbs v. Block,* 778 F.2d 1318 (8th Cir.1985), has been affected by *Price Waterhouse. See Price Waterhouse,* 109 S.Ct. at 1784 n. 2.

ever, holds a doctorate in physical education administration, with a minor in statistics, whereas Gray holds only a master's degree. Welch had experience in academic counseling for a college football team and had been a coach. Welch took a cut in pay when he accepted his new position with the University. Additionally, Welch's job description included interpreting NCAA rules, which had formerly been done by Farrell. We are satisfied, therefore, that there were legitimate reasons for the salary differential between Gray and Welch.

Gray also contends that the University provided Welch with a larger staff than it had provided for her and that Welch was allowed to attend more conferences and out-of-town games than she had been allowed to attend. The evidence showed, however, that Welch was allowed to hire more student assistants because of his increased job responsibilities. Gray was allowed to travel to out-of-town games after she expressed an interest in doing so, and although she was not allowed to attend every conference that she requested to attend, the athletic department did allow her to attend several conferences during her tenure.

The district court expressed reservations about the soundness of some of the University's explanations for terminating Gray, but did not find that the reasons were false or unworthy of credence. After reviewing the record, we might well agree with the district court that some of the reasons given by Hatfield to justify Gray's termination—for example, the matter of the posting of Kingsby's grades—appear to be less than weighty, if not almost laughable. Like the district court, however, our function is not to question the emphasis, undue as it may appear to some, placed upon intercollegiate athletics but to determine whether the personnel decisions made in carrying on an athletic program are made in a nondiscriminatory manner. Our task on appeal is not, as Gray requests, to determine whether the evidence offered at each sequence of the *McDonnell Douglas* analysis was adequate. Rather, after the district court has decided the ultimate question of discrimination *vel non*, we determine whether the record supports the court's finding that the University did not dismiss Gray because of her sex. *See U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711 at 714–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *MacDissi v. Valmont Industries, Inc.*, 856 F.2d 1054, 1059–60 (8th Cir.1988); *Crutchfield v. Maverick Tube Corp.*, 854 F.2d 307, 309 (8th Cir.1988). Our review of a district court's findings is circumscribed by the admonition that

> when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Anderson v. City of Bessemer City*, 470 U.S. at 575, 105 S.Ct. at 1512.

There is no objective or documentary evidence that contradicts the testimony of the University's witnesses, nor was their testimony so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. *Id.* Accordingly, we conclude that the district court's finding that the University did not discharge Gray because of her sex is not clearly erroneous and that the judgment dismissing her action must therefore be affirmed.

McMILLIAN, Circuit Judge, concurring in part and dissenting in part.

I respectfully dissent. I concur only in that part of the majority opinion finding that the district court did not abuse its discretion in refusing to recuse itself. I would reverse the district court's holding that appellees did not discharge Adella Gray from her position as academic coordinator for the University of Arkansas football team because of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) (1988).

The district court erroneously treated this case as a circumstantial evidence case, requiring that the burdens of production and persuasion be allocated as set forth in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 802–03, 804–05, 93 S.Ct. 1817, 1824, 1825, 36 L.Ed.2d 668 (1973) (*McDonnell Douglas*) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981) (*Burdine*). Because Gray presented direct evidence of intentional gender-based discrimination against her by appellees, the burdens of production and persuasion should have shifted to appellees to show by a preponderance of the evidence that they would have made the same decision to terminate Gray's employment had they not been motivated to do so by the unlawful discriminatory reason. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (*Mt. Healthy*); see *Price Waterhouse v. Hopkins*, —— U.S. ——, 109 S.Ct. 1775, 1789–91, 104 L.Ed.2d 268 (1989) (*Hopkins*) (approving *Mt. Healthy* same decision analysis in Title VII mixed motive cases). The district court disingenuously avoided the *Mt. Healthy* analysis by finding that all of the direct evidence of intentional gender-based discrimination presented by Gray was not credible.

The decision by the Supreme Court to adopt the *Mt. Healthy* same decision test in mixed motive cases such as *Hopkins* leads to the inescapably logical conclusion that the same decision test should likewise be applied in cases where direct evidence of discrimination is presented as the sole motivating factor which led to the adverse employment action:

> It would be illogical, indeed ironic, to hold a Title VII plaintiff presenting direct evidence of a defendant's intent to discriminate to a more stringent burden of proof, or to allow a defendant to meet that direct proof by merely articulating, but not proving legitimate, nondiscriminatory reasons for its action.

*Bell v. Birmingham Linen Serv.*, 715 F.2d 1552, 1556–57 (11th Cir.1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *accord Ramirez v. Sloss*, 615 F.2d 163, 168 (5th Cir.1980) ("In the rare situation in which the evidence establishes that an employer openly discriminates against an individual it is not necessary to apply the mechanical formula of *McDonnell Douglas* to establish an inference of intentional discrimination; the showing has already been made directly."); *see also Hopkins v. Price Waterhouse*, 825 F.2d 458, 470 (D.C.Cir.1987) (mixed motive case holding that when plaintiff offers "direct evidence that her gender was a significant motivating factor in [adverse employment decision affecting her] ... the utility of the *McDonnell Douglas–Burdine* analysis is at an end, for the question is no longer whether plaintiff was 'treat[ed] ... less favorably than others because of ... [her] sex,' but rather whether that less favorable treatment in fact caused the adverse [employment] decision") (quoting *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977)), *rev'd on other grounds*, —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (approving same decision analysis in Title VII mixed motive cases).

Because Gray has already established liability via the direct evidence of discrimination she presented at trial, *see Hopkins*, 109 S.Ct. at 1788 n. 11, evidence that was improperly disregarded by the district court, this case should be remanded only to determine the nature of the relief available to Gray. Moreover, even assuming for the sake of argument that the *McDonnell Douglas* standard is the correct analytical framework in a direct evidence case such as this, Gray established by a preponderance of the evidence that the legitimate nondiscriminatory reasons for her termination articulated by appellees were merely pretextual and were offered to obscure the unlawful reason for her discharge. *See McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. Because the district court improperly allocated the burdens of proof and persuasion and erroneously found that no unlawful discrimination had occurred, its judgment should be reversed, and the case should be remanded with instructions to find in favor of Gray and to determine what relief should be awarded to Gray.

Regardless of which analytical framework should have been applied by the district court, the issue of discriminatory intent is an ultimate question of fact to be

decided from all of the evidence before the district court, *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983), and is reversible if the reviewing court "concludes that [its] finding[s] [of fact are] clearly erroneous under Rule 52(a)" of the Federal Rules of Civil Procedure. *Pullman–Standard v. Swint,* 456 U.S. 273, 290, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982). While I recognize that the reviewing court must give great deference to the fact-finding function and credibility determinations of the district court, *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985), it is not our function to act as a rubber stamp when such determinations are clearly erroneous. *Estate of Palmer v. Commissioner,* 839 F.2d 420, 423 (8th Cir.1988) (citations omitted); *Jenkins ex rel. Agyei v. Missouri,* 807 F.2d 657, 696 n. 3 (8th Cir.1986) (Lay, C.J., dissenting). Factual findings are clearly erroneous when the reviewing court, after examining all of the evidence, "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 393–95, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948). I am left with such a conviction.

In my view, the district court's primary error lies in the fact that it totally disregarded as not credible the tape-recorded conversations between Gray and Lon Farrell, then Assistant Director of Athletics for the University of Arkansas (University), that Gray introduced into evidence. The reasoning of the district court was two-fold. First, it apparently takes a dim view of anyone who surreptitiously gathers evidence by recording conversations regardless of the exigencies of the particular situation which may lead one to do so. *Gray v. University of Arkansas,* 658 F.Supp. 709, 720–21 (W.D.Ark.1987) (*Gray I*). The district court seems to have relied on its subjective feelings concerning such evidence despite the fact that such conversations are admissible under the Federal Rules of Evidence. *See* Fed.R.Evid.Rules 1101–1103. Second, it found Farrell's statements to be wholly without credibility because he was suffering from emotional illness at the time he made them. *Gray I,* 658 F.Supp. at 719. Neither one of these reasons, alone or taken together, is sufficient to totally discredit Farrell's statements although they may properly affect the weight to be given the statements.

The fact that Gray secretly recorded personal and phone conversations between Farrell and her was not due to some sort of inherent character flaw as the district court seems to suggest. Rather, it was a practical response to the exigencies of the situation in which she found herself. Once Gray refused to sign the resignation letter presented to her by Farrell, she was in an openly adversarial position with the athletic department. It surely became apparent to Farrell at that time that Gray was contemplating some sort of legal action against appellees. Gray even stated that she had consulted with an attorney. *Id.* at 718. From that time forward, it was extremely unlikely that Farrell would incriminate either the athletic department or himself by openly admitting that gender discrimination was the reason for Gray's termination. This assumption is borne out by the fact that Farrell altered the personnel action form regarding Gray's termination. On August 9, 1985, Farrell went to the University EEO office and altered part of the reason for Gray's termination to "Also we need a *person* ...." (Emphasis added.) It is unclear what the altered portion said beforehand, but in light of all the surrounding circumstances, the most reasonable construction is that prior to the alteration, it stated, "Also we need a *man* ...." (Emphasis added.) The district court did not view this alteration as probative evidence because of Farrell's emotional illness. *Id.* I, on the other hand, find it to be highly probative both of the fact that Farrell was covering up evidence of gender discrimination and of the fact that he was thinking clearly enough during the time period during which he made the incriminating statements to Gray that the district court should have given credence to his statements.

Farrell's actions in this regard are a blatant example of tampering with potential evidence. Compare the district court's con-

cern about the appearance of handwritten notes made by Gray after her May 20, 1985, conversation with Coach Hatfield. *Id.* at 728. Contrary to the finding by the district court that Gray did not avail herself of the opportunity to explain the condition of these notes, *see id.*, the trial transcript shows that Gray did just that. A careful review of the record indicates that the "cut and paste" condition of the notes was most likely due to their being copied on different sized paper than the originals. Tr. at 4–128 to 4–139. Further, when a person makes notes of a conversation after the conversation ends, it is perfectly natural to make additions after having had time to reflect and remember. The district court's concern about the interlineation of Gray's notes is puzzling in light of the fact that it was not at all concerned about Farrell's blatant erasure and alteration of an official document on file with the University EEO office, a document that has everything to do with the merits of the case.

Gray did nothing immoral or illegal. What she did do was gather evidence of unlawful discrimination from one well-positioned to know, the University assistant athletic director. I do not condone every instance of gathering evidence by surreptitiously recording conversations. It seems to me, however, that in cases such as this, rather than being inherently unreliable, evidence gathered in this manner tends to be highly reliable because the speaker feels free to speak without any fear of recrimination.

Moreover, the fact that Farrell was emotionally ill at the time he made the incriminating statements does not mean that every word he spoke was untrue. To the contrary, Farrell's statements to the effect that Gray was discharged because Hatfield wanted a man in that position were corroborated by other evidence in the record. In fact, the record is permeated by evidence of discriminatory statements and actions of the athletic department staff. Further, Gray presented expert testimony which confirmed that Farrell did not suffer from near total memory loss as suggested by the district court. The fact that there was corroborating evidence should have given the district court pause before it decided to totally disregard Farrell's statements.

Much is made by appellees of their contention that Gray did not have the respect of the football players and University faculty. Not one player who testified, however, indicated that he had no respect for Gray. On the contrary, the players testified that they did respect Gray. The district court chose not to believe this testimony. What motive the players would have for fabricating their testimony is beyond me. Further, appellees admitted that no one, not even the coaches, commanded the respect of all of the football players. Tr. at 149–51. The alleged lack of respect for Gray is not the only reason given by appellees for Gray's discharge. Depending upon when and in what context appellees were asked to give their reasons for Gray's discharge, at least four different reasons were given as *the* reason for her discharge. The fact that appellees changed their story several times indicates that they were concocting after-the-fact justifications, i.e., pretextual reasons, for their discriminatory action. *Cf. Hopkins*, 109 S.Ct. at 1791 (in mixed motive case, employer may not meet its burden by offering a legitimate reason for its decision "if that reason did not motivate it at the time of the decision").

Here, we have a situation where Gray, a woman, designed an academic counseling program for college athletes. She implemented the program with relatively few problems, all of which were of the type that one would expect to occur in a new program that was designed to work against the unfortunate inclinations of many young athletes to pay little attention to the academic aspects of attending college. According to the testimony presented in the district court, the problems that did occur were not attributed to incompetence or neglect on the part of Gray. In fact, Coach Hatfield's philosophy was that his football "players were largely responsible for their own actions and that they would be responsible for getting to class on time and to perform the functions necessary to stay in school and stay eligible." *Gray I*, 658 F.Supp. at 713.

Gray, initially described as "pushy" by the Dean of the College of Education, Dr. Fred Vescolani, a term with unfavorable stereotypical connotations and generally used in reference to females and rarely in reference to males, was replaced by a man. The reason: appellees felt they needed a "stronger personality," a characteristic that, in the view of appellees at least, seems to apply only to males. The substantive distinction between "pushy" and "strong personality" otherwise escapes me. *See Hopkins,* 109 S.Ct. at 1791 ("stereotyped remarks can certainly be evidence that gender played a part" in adverse employment decision).

The man who replaced Gray, Jerry Welch, was paid a higher salary than Gray, was compensated for "extra duties" that had been performed by Gray for no additional pay, was given more support staff than Gray, and received more benefits in the form of out-of-town conference and game attendance than Gray. Welch was hired in violation of the University affirmative action plan and just happened to be an old (male) teammate of the (male) football coach. The advertisement placed by the athletic department seeking a replacement for Gray was obviously a mere formality. Welch had been pre-selected by Hatfield before the advertisement had even been run. *See* Maj. Op. at 1397. The University also violated its affirmative action plan by not providing Gray with written evaluations of her performance before she was summarily dismissed. Tr. at 36. The feedback Gray did receive was not negative. When Ken Hatfield replaced Lou Holtz as head football coach, Gray was told by Coach Hatfield "to keep handling things as she had in the past." *Gray I,* 658 F.Supp. at 712–13. *See Craik v. Minnesota State Univ. Bd.,* 731 F.2d 465, 472–73 (8th Cir. 1984) (failure to implement affirmative action plan relevant to question of discriminatory intent) (citations omitted).

Further evidence of appellees' discriminatory practices is the fact that Patricia Haynes, the woman who replaced Coach Larry Dixon as the NCAA record-keeper for the athletic department, was paid $9500 per year less than Coach Dixon had been paid for performing the same function. When viewed in isolation, Coach Broyles' explanation of the salary difference may appear to be legitimate. *See Gray I,* 658 F.Supp. at 716. When viewed in the context of appellees' practices in regard to Gray, the salary difference sheds light on their attitude that functions performed by women are less valuable than those same functions when performed by men. Farrell, for example, initially believed that the position created by Gray should be filled by a man. *Id.* at 711. Coach Broyles initially refused to provide Gray with a secretary saying, "she's a woman, she can do her own typing," Tr. 4–6, 4–7, 4–21, whereas Welch, a man, was given ample clerical and secretarial help *as a matter of course. See Hopkins,* 109 S.Ct. at 1791 (stereotypical remarks are evidence of gender discrimination).

Contrary to the majority opinion, I find that the discrepancy in salary and benefits paid to Gray and Welch is not adequately explained by supposed increased responsibilities assumed by Welch as opposed to those performed by Gray. The advertisement run by the athletic department for Gray's replacement listed job responsibilities that the record clearly establishes were performed by Gray. *Id.* 658 F.Supp. at 717. The majority asserts that an additional responsibility assumed by Welch was interpretation of NCAA rules; however, Coach Hatfield testified "that it was Adella Gray's job to interpret the [NCAA] rules and to make certain that they were complied with." *Id.*

Despite the fact that Gray was terminated for alleged incompetence, she was asked to stay on and "train the new *man.*" (Emphasis added.) Brief for appellant at 21. The "new man" apparently had difficulty catching on to the requirements of his new position (this despite the fact that he had similar experience in a prior job) and several times approached Gray and asked for her advice and assistance. *Id.* at 25.

After reviewing all of the evidence in the record, I am left with the definite and firm conviction that the district court erred in finding that the motivation for discharging Gray was not gender-based. Further, I am

convinced that the central problem in this case is that appellees have a gut feeling that football is exclusively a man's world where the good old boy ethic is perfectly acceptable and even desirable. This is just the type of insidious attitude that Title VII was enacted to eliminate. We should not play a part in condoning or perpetuating such attitudes. I would reverse the district court and remand with directions to enter judgment for Gray and determine and award appropriate relief to Gray.