**F I L E D**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ROBERT J. BROWN, SR.,

     Plaintiff-Appellant,

v.

DONALD L. EVANS, Secretary, United
States Department of Commerce,[*]

     Defendant-Appellee.

No. 01-1292
(D.C. No. 99-WM-1622)
(D. Colorado)

**ORDER AND JUDGMENT**[**]

Before **LUCERO, HOLLOWAY**, and **MURPHY**, Circuit Judges:

**I**

**THE FACTUAL BACKGROUND**

**A**

The district court had jurisdiction over this case under 42 U.S.C. § 2000e-5(f)(3).

---

[*]It should be noted that the plaintiff's opening brief named William Daley as Secretary of Commerce, while the defendant's brief and plaintiff's reply brief show the name of Donald Evans, reflecting the change in administration since the lawsuit was filed.

[**] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

The jurisdiction of this court exists pursuant to 28 U.S.C. § 1291 because the order and judgment from which the plaintiff-appellant appeals is a final decision disposing of all claims which the plaintiff-appellant has against the defendant-appellee.

This is an appeal from a grant of summary judgment in favor of the defendant employer, the Secretary of the United States Department of Commerce, in a Title VII case. The plaintiff-appellant employee, Robert J. Brown, Sr. ("Brown"), who is African American, alleged that he was discharged because of racial discrimination. Brown was nominally employed by the Secretary of Commerce, but the subagency involved was the Census Bureau, United States Department of Commerce.

On January 12, 1998, Brown was appointed as a probationary Community Partnership Specialist at the GG-11 grade level with the Census Bureau. His appointment was subject to the completion of a one-year probationary period, and was temporary, not to exceed three years. Aplt. App. 458 ¶ 7. Brown was fired on January 5, 1999 just before completing this standard one-year probationary period. Aplt. App. 462 ¶ 45.

In November 1997, Brown applied and was deemed qualified for two postings for temporary employment at three levels (GG-9, GG-11, and GG-12) with the United States Department of Commerce, Bureau of the Census, Denver Regional Census Center (hereinafter "Census Bureau"), for a Temporary Community Partnership Specialist. Aplt. App. 457 ¶¶ 4-5.

On December 9, 1997, Pamela Lucero (Hispanic), the Regional Partnership

Coordinator with defendant's Denver Regional Census Center, Wayne Hatcher (White), the Assistant Regional Census Manager, and Susan Lavin (White), the Regional Director, interviewed Brown for the position of Community Partnership Specialist. Lucero recommended Brown's employment to Hatcher who subsequently hired Brown. Aplt. App. 242. On January 12, 1998, Brown was appointed as a probationary Community Partnership Specialist at the GG-11 grade level with the Census Bureau.

**B**

The Census Bureau Handbook states that "[a] probationary employee may be separated merely by written notice that their continued employment is not in the interest of the government." Aplt. App. 458 ¶ 5. Brown was aware of this policy and of his EEO rights. The partnership specialists were divided into three groups: Government Specialists, Community Specialists, and Tribal Government Specialists. Each group had a team leader who was at the GS-12 level. The position of team leader for the Community Specialist group to which Brown belonged was not filled until September 1998 when Earl Brotten, who is also African-American, was hired. Until this position was filled, Lucero acted as Brown's direct supervisor and acting team leader from January 12, 1998, to September 21, 1998. Aplt. App. 459 ¶ 13.[1] November 2, 1998, Brown received a performance rating at the low end of the "fully successful" category. Aplt. App. 462 ¶ 39. The "Fully Successful" rating is an intermediate rating;

---

[1]It should be noted that Lucero's husband is also African-American.

"Marginal/Minimally Satisfactory" and "Unacceptable/Unsatisfactory" precede and "Commendable" and "Outstanding" follow it. Aplt. App. 408.

In late December 1998, Brotten recommended the termination of Brown's employment due to Brown's continued disregard of his supervisory directions and Brown's failure to follow the chain of command. Aplt. App. 28 ¶ 52, 351 ¶ 52. Lucero concurred with the recommendation to terminate Brown. Aplt. App. 28 ¶ 53, 351 ¶ 53. On January 4, 1999, Hatcher sent Brown a letter notifying him that he was ending Brown's employment effective January 5, 1999. The letter made reference to Brown's unacceptable conduct: "Despite ongoing instruction and feedback, you have demonstrated an unwillingness to accept management direction. Also, you are not flexible and you are often uncooperative in accepting changes in decennial operations." Aplt. App. 492.

The letter provided three examples of Brown's unacceptable behavior. The first example had two parts: the first part chastised Brown for a verbal altercation with a co-worker who had directed racial epithets at Brown; the second part criticized Brown for his subsequent, frequent contacting of higher officials instead of immediate supervisors regarding job issues, despite directions to follow the "chain of command." Aplt. App. 492. The second example was Brown's criticism of a management decision to send recruiting materials to the Las Vegas area. Finally, the termination letter took issue with Brown's persistence in planning a trip to Utah despite directions to concentrate on Colorado and postpone the Utah trip. Aplt. App. 493.

It is helpful to further explore these three examples of Brown's "unacceptable conduct" in order to develop a more detailed picture of the events leading up to Brown's termination. The first example from the termination letter involves an incident on March 20, 1998, when what appears to have been a disturbing pattern of treatment of Brown by his co-worker Hernandez, culminated in a single confrontation. Hernandez, who is Hispanic, had repeatedly addressed Brown with the remarks: "What's up dog?" or "What's up black?" Aplt. App. 380. On March 20, apparently feeling that this treatment had gone on too long, Brown engaged in an "extremely heated verbal disagreement" with Hernandez over his use of derogatory names. Aplt. App. 380. Hernandez was at the GG-12 level and had previous federal experience at that grade level. Aplt. App. 460, ¶ 21.

Although Brown's immediate supervisor, Lucero, was not in the office on March 20, Brown was aware that Lucero would be returning to the office the following Monday, March 23, 1998, and Brown knew how to contact her at home. Aplt. App. 460 ¶ 22. However, following the altercation, Brown complained to Jamey Christie, the Assistant Regional Census Manager, about Hernandez's verbal abuse, because the altercation had resulted in a heightening of tension between Brown and Hernandez which, in Brown's opinion, required "immediate attention by the Bureau's management officials." Aplt. App. 382 ¶ 21. Hernandez called Brown at home during the weekend following the incident and apologized to Brown. Aplt. App. 384 ¶ 27.

Lucero learned of the altercation from Christie upon her return to the office on

Monday, March 23, 1998. Aplt. App. 460 ¶ 23. She subsequently met with Hernandez on Tuesday, March 24 and with Brown on Wednesday, March 25, 1998 and informed both men that derogatory language would not be tolerated in the office. Aplt. App. 460 ¶¶ 24-26. In addition, during her meeting with Brown, Lucero informed Brown of the importance of following the proper chain-of-command in the workplace. It should be noted that Lucero spoke to Hernandez before she spoke to Brown and waited for a period of two days after her return to discuss the incident with Brown. Brown did not file an EEO complaint or seek EEO counseling with regard to the incident with Hernandez. Aplt. App. 384 ¶ 28.

The second example from the termination letter involved recruiting announcements that the Bureau intended to use in Las Vegas. According to Brown, the Bureau had prepared two sets of announcements for one position. Lucero had ordered the sending of one job announcement by Hernandez to the Hispanic community in Las Vegas containing a bilingual requirement for the position. Lucero also directed Brown to send a different announcement for the same position to the black community which excluded the bilingual requirement. Aplt. App. 385-386 ¶ 30. Brown questioned Lucero about the efficacy of using these differing announcements because he was concerned that his and the Bureau's credibility would be hurt in the black community if applicants were led to believe that they did not need Spanish skills when they actually did. *Id.* Lucero later instructed Brown to send both announcements to the black community. *Id.* It is worth

noting that although the friction between Brown and Lucero was cited as an example of unacceptable behavior in Brown's termination letter, Lucero rated Brown "Fully Successful" in Brown's November 1998 performance evaluation which was composed two months before Brown's termination.

The third example from Brown's termination letter involves a series of tense interactions between Brown and his supervisors in December 1998. On December 3 and 4, 1998, Brotten ordered Brown to postpone a scheduled trip to Utah because management had decided to refocus their efforts locally. On December 7, 1998, Brown mentioned his previously scheduled trip to Utah to Brotten, and Brotten repeated his instruction for Brown to postpone his trip. On December 9, 1998, Brown sent e-mail messages to Brotten, Lucero, Hatcher, and Laura Lunsford expressing concern about management's change in work focus. On December 11, 1998, Brown again discussed the trip to Utah with Brotten who repeated his explanation of the short-term strategy of focusing on Denver. Later the same day, Brown sent an e-mail message to Lucero, Hatcher, Hernandez, and Tanya Hughes (Decennial Clerk), alleging that Brotten had "cussed" at him during their December 11, 1998, discussion of the trip to Utah. Aplt. App. 462 ¶ 44. It should be noted that the majority of these persons were higher level supervisors and that Brown's habit of going up the chain of command with complaints was one of the reasons given for firing him.

In addition to the circumstances that the Bureau asserts in Brown's termination

letter were directly related to his firing, Brown cites two instances of possible racial prejudice by Lucero. First, Brown asserts that Lucero accused Brown of being "behind" a letter which was received from officials of the NAACP in Omaha criticizing the Bureau for its employment practices. Aplt. App. 426 p.24:23-25.[2] Second, Belva Morrison, one of Brown's co-workers, testified that Lucero had told her that she was going to hire a black person to fire Brown. Aplt. App. 426-27 p.24:23-25:8. Morrison understood this statement to mean that Lucero intended to hire a black person so that person could fire Brown without there being any appearance of racial discrimination. Aplt. App. 427 p.25:14-26:4.

The record shows that Brotten, who is black, was interviewed for the Team Leader position solely by Lucero and that no other applicants were interviewed for the position by Lucero. Aplt. App. 430 p.9:17-25 & 434 p.42:21-25. In addition, Lucero had worked with Brotten previously in both the public and private sectors. Aplt. App. 434 p. 42:2-11 & p. 43:14-25, p.44:1-14.

## II

## THE RULING BELOW

The district court examined the Census Bureau's evidence concerning Brown's

---

[2]These cites are to section in the appendix which reproduce transcripts of depositions. Each page of the appendix which deals with deposition transcripts is broken into four parts, each containing a page of the transcript. The first part of the citation refers to the page of the Appendix, the second part refers to the pages of the transcript, the third part refers to the lines on that page. For example: Aplt. App. 426 p.24: 23-25, refers to page 426 of the appendix, page 24 of the transcript and lines 23-25 of page 24 of the transcript.

disregard for the chain of command on five occasions[3] and two instances of insubordination.[4] The court noted that Brown did not refute this evidence but instead asserted that his conduct was reasonable under the circumstances.

The district court dismissed Brown's argument that his disagreement with management over the reasonableness of his conduct was enough to establish pretext. The plaintiff, the court asserted, may not establish pretext simply by arguing that his actions were reasonable. Aplt. App. 495, citing *Kendall v. Watkins*, 998 F.2d 848, 851-52 (10th Cir. 1993) (recognizing that an employer's reason "need not be a sound business reason, or even a fair one") (internal citations and quotes omitted). Instead, the plaintiff has to demonstrate that the defendant's proffered reasons are not the real reason for his termination. Aplt. App. 495. The district court concluded that the plaintiff failed to point to evidence sufficient to create a genuine issue of material fact as to whether the defendant's articulated reasons for termination were a pretext for unlawful discrimination. For these reasons, on May 23, 2001 the district court granted the Census Bureau's motion

___

[3] First, on March 20, 1998, Brown discussed his verbal altercation with Hernandez with a supervisor outside his chain of command. Second, on July 24, 1998, Brown asked Wayne Hatcher, Assistant Regional Census Manager, about a salary increase. Third, on October 20, 1998, Brown jumped three levels of supervisors when he discussed a call from a contact directly with the Regional Director's office. Fourth, on December 9, 1998, Brown sent e-mail messages to his supervisor and several people outside his chain of command complaining about the strategic decision that resulted in the postponement of his Utah trip. Finally, on December 11, 1998, Brown sent another e-mail to several people not in his chain of command to complain about his supervisor.

[4] First, Brown refused to distribute a recruiting announcement per his supervisor's instructions to Brown's contacts in Las Vegas. Second, Brown refused to postpone his trip to Utah when management decided to refocus its efforts locally.

for summary judgment.

## III

## OUR STANDARD OF REVIEW

Since the order appealed from granted summary judgment, the standard of review is *de novo,* and this court applies the same legal standards appropriate for the district court. *Kendrick v. Penske Transportation Serv., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). This court views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. *See McNight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998). The nonmovant is given "wide berth to prove a factual controversy exists." *Jeffries v. Kansas, Dep't of Soc. & Rehab. Servs.*, 147 F.3d 1220, 1228 (10th Cir. 1998) (citation omitted).

The court reviews the factual record and draws all reasonable inferences therefrom most favorably to the nonmovant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 781 (10th Cir. 1995); Blue Circle Cement, Inc. v. Board of County Commissioners,* F.3d 1499, 1503 (10th Cir. 1994). However, the nonmoving "party must identify sufficient evidence that would require submission of the case to a jury." *Jensen v. Redevelopment*

*Agency of Sandy City*, 998 F.2d 1550, 1555 (10th Cir. 1993). It is not enough that the nonmovant's evidence be "merely colorable" or anything short of "significantly probative." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 249-50 (1986)). The nonmoving party may not rest upon its pleadings, but its response must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. To accomplish this, the fact must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The court conducts this review from the perspective of the district court at the time it made its ruling, ordinarily limiting the review to materials adequately brought to the attention of the district court by the parties. *Id.*

Brown's claims will be analyzed under the *McDonnell Douglas* three-step burden-shifting framework because he offered no direct evidence of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the complainant in a Title VII case must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing that the plaintiff: (i) belongs to a protected class; (ii) was qualified and satisfactorily performing his job; and (iii) was terminated under circumstances giving rise to an inference of discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 n. 6 (1981); see also *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1417 (10th Cir. 1993). Here, the Census Bureau

does not dispute that Brown presented a prima facie case. *See Appellee's Answer Brief*, at 8.

Second, after the complainant presents a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. *McDonnell Douglas*, 411 U.S. at 802. In the present case, the Census Bureau says that Brown was fired for unacceptable conduct which included an unwillingness to follow the chain of command, resistance to management's direction, and general inflexibility and uncooperativeness.

Finally, the claimant is afforded a fair opportunity to show that the employer's stated reason for claimant's rejection was in fact pretext. *McDonnell Douglas*, 411 U.S. at 804. Since the first two prongs of the *McDonnell Douglas* framework have been satisfied here, the only issue this court must address is whether there is evidence of pretext.

## ANALYSIS OF THE PRETEXT ISSUE

To establish pretext a plaintiff must show either that "a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256; *see also Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1317 (10th Cir. 1999). A plaintiff may accomplish this by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a

reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997) (quotation and citation omitted).

A plaintiff usually makes a showing of pretext in one of three ways. First, a plaintiff can provide "evidence that the defendant's stated reason for the adverse employment action was false." *Kendrick*, 220 F.3d at 1230. Second, plaintiff can submit "evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." *Id*. Finally, plaintiff can produce "evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff." *Id*. A plaintiff who wishes to show that the company acted contrary to an unwritten policy or practice often does so by providing evidence that he was "treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Id*. The plaintiff has the burden of showing that he and the employees he seeks to compare himself with were similarly situated. See *Kelley v. Goodyear Tire & Rubber Co.*, 220 F.3d 1174, 1178 (10th Cir. 2000). The plaintiff may also provide evidence of defendant's reaction, if any, to respondent's legitimate civil rights activities to show pretext. *McDonnell Douglas*, 411 U.S. at 804.

This court, although bound to view the facts in the light most favorable to the non-movant, when analyzing a contention of pretext examines the facts "as they appear to the person making the decision to terminate plaintiff." *Kendrick*, 220 F.3d at 1231. Brown,

- 13 -

the plaintiff, has the ultimate burden of demonstrating that the Census Bureau's stated reasons for his termination are in fact a pretext for unlawful discrimination, *Jones v. Denver Post Corp.*, 203 F.3d 748, 752-53 (10th Cir. 2000). At this stage, Brown must provide evidence that reveals a genuine issue of fact as to pretext. *Celotex,* 477 U.S. at 322-23.

A challenge of pretext requires us to look "at the facts as they appear to the person making the decision to terminate plaintiff." *Kendrick*, 220 F.3d at 1231; *see also Shorter*, 188 F.3d at 1209 (stating that the manager's perception of the employee's performance rather than the employee's subjective evaluation of her own performance, is relevant for determining pretext). Evidence which is a mere suggestion of pretext is not sufficient grounds for resisting a summary judgment motion. In *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148-49 (2000) the Court discussed circumstances where such a mere suggestion of pretext is not sufficient:

> Whether judgment as a matter of law is appropriate in any particular case will depend on a large number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

Here we feel that the showing of the Plaintiff Brown is not sufficient. It is not the plaintiff's perception of the facts, but that of the employer at the time of the decision to discharge the plaintiff, which controls. *See Selenke v. Medical Imaging of Colorado,* 248 F.3d 1249, 1261 (10th Cir. 2001); *Kendrick v. Penske Transp.Service*, 220 F.3d 1220,

1231 (10th Cir. 2000). "Merely showing the reason articulated by the employer is wrong or unreasonable will not suffice." *Kendall v. Watkins*, 998 F.2d 848, 851 (10th Cir. 1993) (citing *Gray v. University of Arkansas*, 883 F.2d 1394, 1401 (8th Cir. 1989)).

We note that it was not Ms. Lucero, but Mr. Hatcher who terminated Plaintiff Brown's employment. He stated in part: "Despite repeated counselings, you continued to circumvent your first level supervisors in order for them to handle problems at the program level and instead you go directly to the ARCM's, usually with issues that are not critical enough to utilize ARCM's time and resources." Plaintiff's Exhibit 3, ¶ 6.

In sum, we feel that the plaintiff's showing is not sufficient to establish pretext for the purpose of defeating the defendant's motion for summary judgment.

Accordingly the judgment of the district court is

    AFFIRMED.

                                                    ENTERED FOR THE COURT


                                                    William J. Holloway, Jr.
                                                    Circuit Judge